# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAILA DAMES, EMILY ROGERS, KATHRYN NEWMAN, MATHANGI MOHANARAJAH, and ANSHU SHAH,

   *Plaintiffs,*

    v.

LEE ROBERTS, AMY JOHNSON, DESIREE RIECKENBERG, BRIAN JAMES, RASHEEM HOLLAND, LAWRENCE TWIDDY, JENNIFER SPANGENBERG, J. KALA BULLETT, and AVERY COOK,

in their individual and official capacities;

NICK LYNCH, N.G. BROWN, FNU LEE, and DESTINY WYLIE,

in their individual capacities,

   *Defendants.*

**COMPLAINT**
DECLARATORY AND INJUNCTIVE RELIEF REQUESTED

Case No. 25-cv-191

## INTRODUCTION

1. On April 26, 2024, Plaintiffs Mohanarajah and Shah—students at the University of North Carolina at Chapel Hill ("UNC Chapel Hill," "the University," or "UNC")—along with Plaintiffs Dames, Rogers, and Newman,

1

gathered on the University's campus, a central hub for protest and activism, to express solidarity with the nationwide student movement for Palestinian lives and liberation.

2. As a part of this protest, Plaintiffs established a temporary, non-violent, non-disruptive encampment for several days on Polk Place—one of the campus's large outdoor quads that is open to the public. The encampment was comprised of camping tents and water pallets. Participants engaged in teach-ins, prayer circles, and occasional chants.

3. The First Amendment protects this activity. But on April 30, 2024, Defendants Lynch, Lee, Brown, and Wylie ("Officer Defendants"), acting at the direction of University officials, with less than thirty minutes notice to some participants, forcibly cleared the encampment. These Defendants unlawfully arrested participants, tearing the cartilage in Plaintiff Rogers' left shoulder in the process.

4. Defendants Roberts, Johnson, Rieckenberg, James, Holland, Twiddy, Spangenberg, Cook, and Bullett ("University Defendants") summarily suspended and banned students, including Plaintiff Mohanarajah, from campus without a hearing, and Defendant James summarily issued immediate indefinite campus bans to non-students, including Plaintiffs Dames, Rogers, and Newman.

2

5.  UNC has a long history of student-led protests. Protesters have occupied busy outdoor spaces on campus such as The Pit, McCorkle Place, and Polk Place, and have occupied administrative buildings, such as South Building, without having to face violent arrests, criminal charges, punitive University disciplinary processes, and campus bans.

6.  For example, between 2017 and 2019, students and non-students staged several protests demanding UNC remove the Silent Sam statue located in McCorkle Place, eventually leading to the physical toppling of the statue. Students involved in toppling the statue were referred to the Honor Court to face disciplinary action. Both students and non-students were arrested, but none were issued criminal trespass charges or banned from campus, nor were they summarily suspended.

7.  Defendants had a far more hostile reaction to Plaintiffs' conduct here. In addition to the forceful police evacuation of the encampment and arrests, University Defendants took the extraordinary action of referring Plaintiff Mohanarajah and other involved students directly to its Emergency Evaluation and Action Committee ("EEAC"), expediting the disciplinary process and circumventing the student-run Honor Court. Defendant James also took the extraordinary action of immediately issuing indefinite campus bans to non-students, including Plaintiffs Dames, Rogers, and Newman, and Plaintiff Mohanarajah, without notice or hearing.

8. Speech on controversial topics is "an inevitable part of the process of attending school" and is protected by the First Amendment. *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 513 (1969). These protections are even more paramount at colleges and universities, where most students are adults and campuses frequently serve as social, cultural, and community gathering spaces for members of the public. *See Healy v. James*, 408 U.S. 169, 180 (1972).

9. University Defendants' decisions to summarily suspend students and issue criminal trespass charges and indefinite campus bans far exceeds UNC's reactions to other, similar protest movements expressing other viewpoints.

10. University Defendants' actions amount to retaliation against protected speech, viewpoint discrimination, and prior restraint of speech in violation of Plaintiffs' rights under the First Amendment to the U.S. Constitution and Article I, Section 14 of the N.C. Constitution. They also deprived Plaintiffs Mohanarajah, Dames, Rogers, and Newman their procedural due process rights protected by the Fourteenth Amendment to the U.S. Constitution and Article I, Section 19 of the N.C. Constitution. Plaintiffs seek declaratory and injunctive relief and nominal damages against these Defendants.

11. Officer Defendants unlawfully arrested Plaintiffs Rogers, Newman, and Dames, violating their rights under the Fourth Amendment to the U.S. Constitution and North Carolina state law. And Defendant Lee's use of

4

excessive force while arresting Plaintiff Rogers is a violation of Plaintiff Rogers' rights under the Fourth Amendment to the U.S. Constitution and North Carolina state law. Plaintiffs seek compensatory, punitive, and nominal damages against these Defendants.

## PARTIES

<u>Non-student Plaintiffs</u>

12. Plaintiff Laila Dames is an undergraduate student at Duke University. She is an American citizen of Palestinian descent. At the time of the encampment, Ms. Dames was the president of the Duke University Students for Justice in Palestine ("Duke SJP") and remains a member. Ms. Dames participated in the nondisruptive encampment at UNC. She slept at the encampment the nights of April 27–29, 2024. Ms. Dames was arrested and cited for second degree trespass on the morning of April 30, 2024, and given an indefinite ban from UNC Chapel Hill's campus because of her participation in the encampment. The criminal charge has since been dismissed, but she remains banned from campus. Ms. Dames wishes to continue to engage in nonviolent and nondisruptive protests on UNC Chapel Hill's campus.

13. Plaintiff Emily Rogers is and was a tenure-track professor of cultural anthropology at Duke University at all times relevant to this Complaint. Professor Rogers is a co-founder of Academics and Staff for Justice in Palestine at Duke University. Professor Rogers participated in the nondisruptive

5

encampment at UNC. She participated during the daytime hours on April 26 and 27, 2024, and slept at the encampment on April 28 and 29, 2024. Professor Rogers was arrested and cited for second degree trespass on the morning of April 30, 2024, and given an indefinite ban from UNC Chapel Hill's campus because of her participation in the encampment. The criminal charge has since been dismissed, but she remains banned from campus and unable to participate in events on UNC Chapel Hill's campus, including academic speaking events and conferences. Ms. Rogers wishes to continue to engage in non-violent, nondisruptive protests, and pursue professional opportunities and fulfill professional obligations on UNC Chapel Hill's campus.

14. Plaintiff Kathryn Newman was a student at Meredith College and member of Meredith College Students for Justice in Palestine ("Meredith SJP") while participating in the encampment. Ms. Newman has since graduated and is now employed by Voices for Justice in Palestine as an organizer. Ms. Newman participated in the nondisruptive encampment at UNC Chapel Hill. She participated during the daytime hours on April 26 and 27, 2024, and slept at the encampment on April 28 and 29, 2024. Ms. Newman was arrested and cited for second degree trespass on the morning of April 30 and given an indefinite ban from UNC Chapel Hill's campus because of her participation in the encampment. The criminal charge has since been dismissed, but she remains banned from campus and unable to organize and participate in protests as is

6

required as a part of her employment with Voices for Justice in Palestine. Ms. Newman wishes to continue to engage in nonviolent and nondisruptive protests on UNC Chapel Hill's campus.

UNC Student Plaintiffs

15. Plaintiff Mathangi Mohanarajah is an undergraduate student at UNC who, at all times relevant to this Complaint, was on a leave of absence from her studies. Ms. Mohanarajah participated in the nondisruptive encampment at UNC Chapel Hill. She participated in and slept at the encampment from its start on April 26, 2024, until its forcible clearing on April 30, 2024. As a result of her participation, Ms. Mohanarajah was summarily suspended and banned from campus by the EEAC and UNC Police Department. Although the disciplinary charges against Ms. Mohanarajah were dismissed on November 5, 2024, Ms. Mohanarajah remains banned from UNC Chapel Hill's campus. Ms. Mohanarajah intends to re-enroll and complete her degree and wishes to attend class and engage in other academic activities on campus. Ms. Mohanarajah also wishes to continue to engage in nonviolent and nondisruptive protests on UNC Chapel Hill's campus.

16. Plaintiff Anshu Shah is and was an undergraduate student at UNC at all times relevant to this Complaint. Mr. Shah participated in the nondisruptive encampment at UNC Chapel Hill. At the time of the encampment, Mr. Shah was a member of the University's Students for Justice in Palestine

7

("UNC SJP") leadership group. Mr. Shah participated in the encampment during the daytime hours on April 26, 27, and 29, 2024. He slept at the encampment on April 26 and 29, 2024. Since the forcible clearing of the encampment, Mr. Shah has been hesitant to exercise his First Amendment rights on UNC Chapel Hill's campus, causing him to skip multiple student actions that have occurred in the time since the clearing of the encampment, out of fear of retaliation and disciplinary action. Mr. Shah also stepped down from UNC SJP leadership the semester following encampment out of fear of retaliation and disciplinary action.

<u>Defendants</u>

17.     Defendant Lee Roberts was the interim Chancellor of UNC Chapel Hill at the time of the encampment and is now the permanent Chancellor. The Chancellor is "the administrative and executive head of the institution and shall exercise complete executive authority therein[.]" N.C. Gen. Stat. § 116–34. The Chancellor is also responsible for defining "the scope of authority of faculties, councils, committees, and officers of the institution."[1] The Chancellor has delegated a portion of his authority in matters of student discipline to the Emergency Evaluation and Action Committee ("EEAC"). Specifically, the

---

[1] The UNC Policy Manual, *Officers of the University*, 100.1, Sec. 502 D.(1),https://www.northcarolina.edu/apps/policy/doc.php?type=pdf&id=57.

EEAC addresses student disciplinary matters involving students who suppos-edly pose danger to the University and those involving emergency situations that require a faster response than the student judicial system can provide.[2] Defendant Roberts has the power to override EEAC decisions. As Chancellor, it is the duty of Defendant Roberts "to secure to every student the right to due process."[3]

18. Defendant Amy Johnson is the Vice Chancellor of Student Affairs at UNC Chapel Hill. The Vice Chancellor of Student Affairs is a permanent member of the EEAC. Defendant Johnson served on the EEAC at all times relevant to this Complaint.

19. Defendant Desiree Reickenberg is the Chair of the EEAC at UNC Chapel Hill, as delegated by the Vice Chancellor for Student Affairs. Defendant Reickenberg served on the EEAC at all times relevant to this Complaint.

20. Defendant Brian James is the UNC Chapel Hill Police Chief and has jurisdiction over "all property owned or leased to the institution employing the campus police officer and that portion of any public road or highway pass-ing through such property or immediately adjoining it, wherever located." N.C.

---

[2] Emergency Evaluation and Action Committee Policy and Procedures, https://policies.unc.edu/TDClient/2833/Portal/KB/ArticleDet?ID=132459.

[3] The UNC Policy Manual, *Officers of the University*, 100.1, Sec. 502 D.(3),https://www.northcarolina.edu/apps/policy/doc.php?type=pdf&id=57.

Gen. Stat. § 116–40.5. The UNC Chapel Hill Chief of Police is a permanent member of the EEAC. The UNC Chapel Hill Chief of Police also has final decision-making authority over campus-ban decisions and their subsequent appeals. Defendant James served as the UNC Chapel Hill Police Chief and on the EEAC at all times relevant to this Complaint.

21. Defendant Rasheem Holland is a UNC Chapel Hill Police Captain and a permanent member of the EEAC as delegated by the UNC Chapel Hill Chief of Police. Defendant Holland served as a UNC Chapel Hill Police captain and on the EEAC at all times relevant to this Complaint.

22. Defendant Captain Lawrence Twiddy is a delegated member of the EEAC at UNC Chapel Hill and served on the EEAC at all times relevant to this Complaint.

23. Defendant Jennifer Spangenberg is the Director of Student Conduct and a permanent member of the EEAC at UNC Chapel Hill. She served as Director of Student Conduct and on the EEAC at all times relevant to this Complaint.

24. Defendants J. Kala Bullett and Avery Cook are delegated members of the EEAC at UNC Chapel Hill and served on the EEAC at all times relevant to this Complaint.

10

25. All defendants referenced in paragraphs 17-24 shall together be referred to as University Defendants and are sued in their individual and official capacities.

26. Defendant Nick Lynch is sued in his individual capacity as a criminal investigator employed with the UNC Chapel Hill Police Department. Upon information and belief, Defendant Lynch is domiciled in North Carolina and subject to the personal jurisdiction of this Court. Defendant Lynch was on duty as a law enforcement official when he arrested Plaintiff Emily Rogers and, acting under the color of state law, deprived Plaintiff Emily Rogers of her constitutional rights and other rights secured by law.

27. Defendant First Name Unknown ("FNU") Lee is sued in his individual capacity as an officer employed with the UNC Chapel Hill Police Department. Upon information and belief, Defendant Lee is domiciled in North Carolina and subject to the personal jurisdiction of this Court. Defendant Lee was on duty as a law enforcement official when he arrested Plaintiff Emily Rogers and, acting under the color of state law, deprived Plaintiff Emily Rogers of her constitutional rights and other rights secured by law.

28. Defendant N.G. Brown is sued in his individual capacity as a law enforcement officer employed with the Greensboro Police Department. Upon information and belief Defendant Brown is domiciled in North Carolina and subject to the personal jurisdiction of this Court. Defendant Brown was on duty

11

as a law enforcement official when he arrested Plaintiff Kathryn Newman and, acting under the color of law, deprived Plaintiff Kathryn Newman of her constitutional rights and other rights secured by law.

29. Defendant Destiny Wylie is sued in her individual capacity as a law enforcement officer employed with the UNC Chapel Hill Police Department. Upon information and belief Defendant Wylie is domiciled in North Carolina and subject to the personal jurisdiction of this Court. Defendant Wylie was on duty as a law enforcement official when she arrested Plaintiff Laila Dames and, acting under the color of law, deprived Plaintiff Laila Dames of her constitutional rights and other rights secured by law.

30. All defendants referenced in paragraphs 26-29 shall together be reference to as Officer Defendants and are sued in their individual capacities.

## JURISDICTION AND VENUE

31. This is an action for declaratory relief, injunctive relief, and damages brought under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202.

32. This Court has subject matter jurisdiction under 29 U.S.C. §§ 1331 and 1343(a)(3)-(4) because the claims arise under federal law.

33. This Court has supplemental jurisdiction over North Carolina state law claims pursuant to 28 U.S.C. § 1367.

12

34. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to Plaintiffs' claims occurred in Chapel Hill, located in this District.

## FACTUAL ALLEGATIONS

## UNC Chapel Hill's Policies

35. UNC Chapel Hill is a public university in Chapel Hill, NC.

36. Many University-owned grounds and buildings are integrated into the larger Chapel Hill community.

37. Many campus buildings, such as UNC Hospital, are dedicated to serving members of the public.

38. Current UNC policies—also in effect in April 2024—do not exclusively apply to students. These policies state that spontaneous expressive activity is permitted on UNC property "as long as such activity is lawful and does not materially and substantially disrupt the functioning on the constituent institution."[4]

---

[4] The UNC Policy Manual, *Policy on Free Speech and Free Expression Within the University of North Carolina System*, 1300.8, https://www.northcarolina.edu/apps/policy/doc.php?id=139;%22.

13

39. Outdoor spaces on the University's campus are open and freely accessible to members of the public, regardless of their status as a student or non-student.[5]

40. Polk Place is a large outdoor quadrangle on UNC Chapel Hill's campus, located between South Road and E. Cameron Avenue. Polk Place functions much like a public park. The grassy area of Polk Place measures roughly 160 feet in width and 640 feet in length, twice the size of a football field.[6]



[5] *See* Exhibit A, Message From Carolina Email ("As a state institution, outdoor public spaces on campus are open to all regardless of their views, as long as they follow the law and University policies.")

[6] THE DIGNITY OF RESTRAINT, *Historic Landscape Framework Plan*, at 10 (2008), https://facilities.unc.edu/wp-content/uploads/sites/256/2015/12/Historic-Landscape-Master-Plan.pdf.

[7] *The First Public University*, https://campaign.unc.edu/story/the-first-public-university/.

14

41.    Both students and non-students frequently use Polk Place for reading, studying, napping, traversing to and from class, gathering with friends, and various recreational activities, such as tossing a frisbee.

42.    University policy does not require prior approval or reservation to access or utilize Polk Place, regardless of an individual's status as a student or non-student.[8]

43.    Polk Place is a traditional public forum much like a city park.[9]

44.    University policy allows UNC staff, students, and non-students to continuously occupy outdoor spaces that do not have posted closure times, so long as the individuals are "respectful of the surrounding area" and do not disrupt sleeping students or violate noise ordinances.[10]

45.    University policy also allows for the const

46.    At the time Plaintiffs utilized Polk Place for the encampment, there were no posted closure times for the area.

UNC Emergency Evaluation and Action Committee

---

[8] Facilities Use Standard,  https://policies.unc.edu/TDClient/2833/Portal/KB/ArticleDet?ID=131344.

[9] *See* Exhibit B, Dispersal Letter ("[A]nyone – including students, faculty and staff – may gather and exercise their rights to free speech[.]")

[10] Policy on Demonstrative Events, https://policies.unc.edu/TDClient/2833/Portal/KB/ArticleDet?ID=131863.

15

47.    The purpose of the EEAC is to address emergency situations that "arise in connection with student behaviors, which require a faster response than the student judicial system's procedures can provide."[11] These situations fall into five categories:

a.    Applicants for Admission or Readmission with Record of Violence or Academic Dishonesty;

b.    Students Whose Behavior Makes them a Threat;

c.    Students Charged With A Crime of Violence;

d.    Students Charged With a Violation of University Drug Policies; and,

e.    Students Whose Behavior Makes Them a Danger to Self.[12]

48.    Defendant Johnson has explicitly stated the EEAC is not a disciplinary process, but rather "a safety process."[13]

49.    Permanent members of the EEAC are the Vice Chancellor for Student Affairs, the Director of Counseling and Psychological Services, a faculty or staff member from the Committee on Student Conduct, a representative for

---

[11] Emergency Evaluation and Action Committee Policy and Procedures, https://policies.unc.edu/TDClient/2833/Portal/KB/ArticleDet?ID=132459.

[12] *Id.*

[13] Exhibit C, Amy Johnson EEAC Text Message.

the Department of Housing and Residential Education, and the University's Chief of the Police.[14]

50.     At all times relevant to this complaint, Defendants Johnson, Rieckenberg, James, Holland, Twiddy, Spangenberg, Bullett, and Cook were members of the EEAC.

## The Encampment in Solidarity with Palestine

51.     In April 2024, students at Columbia University erected tents on a university lawn to protest the ongoing human rights violations in the Gaza Strip ("Gaza").

52.     Soon after, university students began establishing encampments all over the U.S., as well as in many other parts of the world.[15] The purpose of the U.S. encampments was to communicate to the U.S. government that its citizens opposed U.S. military aid being used to violate human rights and to urge universities to divest from investments that profit from these violations.

53.     Protests on university campuses happened in approximately 45 states.

---

[14] Emergency Evaluation and Action Committee Policy and Procedures, https://policies.unc.edu/TDClient/2833/Portal/KB/ArticleDet?ID=132459.

[15] *See* Willem Marx, *Campus Protests Over the War in Gaza Have Gone International*, NPR, May 3, 2024, https://www.npr.org/2024/05/03/1248661834/student-protests-gaza-universities-international.

54. Much like encampments erected to protest the Vietnam War and the South African Apartheid, the purpose of these demonstrations was to send a political message to the U.S. government and university officials concerning U.S. foreign policy.

55. The erection of the tents was aimed at communicating a message of solidarity with the Palestinian people—many of whom were forcibly displaced and, as a result, living in tents—and a rejection of the U.S. government's foreign policy decision-making.

56. On Friday, April 26, 2024, members of UNC SJP,[16] along with other students and non-students, joined thousands of students across the U.S. and established a nondisruptive encampment on the grassy areas of Polk Place.

57. The approximate location of the encampment was on the grassy area located between Gardner and Murphey Halls.

---

[16] UNC's SJP has since been suspended by the EEAC.

18





[17]

58. One of the purposes of the encampment was to provide a space for likeminded students and non-students to freely associate with each other.

59. Members of the UNC SJP, the Duke SJP, Meredith College SJP, and similar faculty groups gathered to participate in the encampment and engage in the exchange of ideas.

---

[17] Liv Reilly, *Encampment forms on Polk Place to protest war on Gaza*, The Daily Tar Heel (April 26, 2024), https://www.dailytarheel.com/article/2024/04/university-sjp-encampment-04262024-israel-divestment-palestine-south-building

19

60. As a large, public university, UNC serves as a hub for free speech, association, and activism, both for enrolled students and other members of the public.

61. Participants shared food, water, and community while highlighting their political message in a manner that was not disruptive to University operations.

62. Encampment activities included celebrations of "teach-ins," prayer circles, singing, guitar-playing, and study groups.

63. Participants, including Plaintiffs, took care to avoid damaging the greenery and trees on Polk Place, ensured walkways were not blocked and remained accessible, and ensured the encampment did not disrupt regular UNC operations, as required by University policy.[18]

64. Throughout the duration of the encampment, non-participant students regularly walked through and gathered on the grass in Polk Place.

65. At no point during the encampment did Plaintiffs or other participants vandalize or damage UNC property.

---

[18] Policy on Demonstrative Events, https://policies.unc.edu/TDClient/2833/Portal/KB/ArticleDet?ID=131863.

66. At no point during the encampment did Plaintiffs or other participants violate noise ordinances, obstruct non-participant students walking through Polk Place, or engage in disruptive conduct.

67. Throughout the duration of the encampment, participants were in communication with UNC administrators, primarily Defendant Rieckenberg, regarding sign placement, adherence to University policies, and any other concerns raised by administrators, such as making sure not to leave building doors propped open.

68. UNC administrators and police regularly checked on the encampment, patrolling the perimeter and speaking with participants.

69. From Friday, April 26, 2024, until about 5:30 AM on Tuesday, April 30, 2024, Defendants did not communicate to participants, including Plaintiffs, that the encampment was violating any policies or disrupting University operations.

**Defendants' Response to the Encampment**

70. Upon information and belief, despite there being no indication that the protestors engaged or had threatened to engage in violent, destructive, or disruptive conduct, UNC coordinated a multi-agency plan of action to clear the encampment at or around 6:00 AM the morning of April 30, 2024.

71. The multi-agency sweep enlisted police officers from the Greensboro Police Department, NC State University Police, NC Central University

21

Police, Graham Police Department, UNCW University Police, Appalachian State University Police, and more.

72.    Notably, neither Chapel Hill nor Carrboro police participated. Indeed, Chapel Hill and Carrboro councilmembers condemned the "use of aggressive police tactics" against students and community members and condemned "the arrests of peaceful protesters."[19]

73.    The Durham Police Department also declined to participate.

74.    Upon information and belief, it was known to the participating law enforcement agencies that the Chapel Hill and Carrboro Police Departments had declined to participate in the coordinated sweep of the encampment, due to concerns over the legality of the response.

75.    On April 30, 2024, at approximately 5:30 AM, UNC administrators shared by hand with some encampment participants a letter signed by Defendant Roberts demanding that encampment participants disperse within approximately thirty minutes or face the possibility of arrest.[20]

76.    This letter was the first time UNC administrators indicated to encampment participants that they intended to clear the encampment.

---

[19] Tammy Grubb, *Town officials condemn 'aggressive police tactics' at UNC, want charges dropped*, The News & Observer (Dec. 3, 2024), https://www.newsobserver.com/news/local/education/article288192710.html

[20] Ex. B, Dispersal Notice.

22

77.     Many participants were still asleep at the time the letter was shared.

78.     The letter falsely alleged that the encampment infringed on the safety of students, faculty, and staff without explaining the basis for its allegations.

79.     The letter also alleged that participants violated University policy by "trespassing into classroom buildings overnight" and "end[ing] [UNC Chapel Hill's] attempts at constructive dialogue."[21]

80.     The letter did not state which participants entered buildings overnight, how this activity was disruptive to University operations, or how this alleged activity damaged University property or was inconsistent with the normal use of University buildings.

81.     On April 27, 2024, UNC Chapel Hill administrators communicated to encampment organizers that the regular course of action for violating the temporary structures policy[22] is removal of the structure (the tents). Nonetheless, Defendant James subsequently directed UNC Chapel Hill Police to

---

[21] *See* Exhibit B.

[22] Facilities Use Standard, https://policies.unc.edu/TDClient/2833/Portal/KB/ArticleDet?ID=131344.

disperse the nondisruptive encampment and to arrest individuals who did not disperse.[23]

82.   At approximately 6:00 AM, law enforcement entered the encampment and began arresting participants who had not dispersed. Many encampment participants, including Plaintiffs, were asleep or just getting up when law enforcement arrived and had not yet received the dispersal letter shared just thirty minutes before.

83.   To effectuate the dispersal, Defendants Wylie, Brown, Lynch and Lee utilized pepper spray and forced participants across the quadrangle, pulling some by their hair, as shown in the following photographs.



[24]

---

[23]   *See* Exhibit D, Christi Hurt Text Message ("Is the posture if [protesters] don't take the [tents] down, then we will? I think so- but chief would probably just want to move to dispersal for violation of policy.").

[24] Brighton McConnell, *LOOK: Scenes from the UNC Gaza Solidarity Encampment, Subsequent Rallies*, Chapelboro.Com (May 1, 2024), https://chapelboro.com/news/unc/scenes-from-the-gaza-solidarity-encampment-at-unc

84.     Arrested participants were escorted to a nearby building where they were criminally charged with second degree trespass.

85.     Many UNC faculty and staff supported the protest and wrote a letter to Defendants Roberts, Rieckenberg, and Johnson, expressing their concerns with the University's forcible clearing of the encampment.[25]

86.     UNC has allowed past overnight protests, including encampments, to continue when they have expressed other viewpoints and has allowed past protests expressing other viewpoints to continuously "occupy" campus buildings, including overnight, without ever forcibly clearing the encampments and pepper spraying, arresting, and issuing indefinite campus bans to individuals involved. [26]

87.     University Defendants responded to this particular encampment with more severity than past protests and despite a lack of property damage or allegations of violence.[27]

88.     **Plaintiff Emily Rogers** is an Assistant Professor of Cultural Anthropology at Duke University.

---

[25] Exhibit E, Letter by faculty and staff for students' right to free speech and protest

[26] *See infra* note 45.

[27] *See* Exhibit F, Amy Johnson Text Message, "Again, the consequence [of not taking down the tent] is we take it down and remove it."

25

89. Plaintiff Rogers is a member of the Academics and Staff for Justice in Palestine group at Duke University.

90. Plaintiff Rogers uses a cane to mitigate a mobility disability.

91. Plaintiff Rogers was present at the encampment on Friday, April 26, and slept at the encampment 27, 28, and 29, 2024.

92. Plaintiff Rogers attended the encampment to engage in political speech criticizing and raising awareness about the U.S.'s complicity in war crimes, petition UNC not to be complicit in those war crimes, take in the speech and expression of other encampment participants, associate with them, and show political solidarity with individuals at the UNC encampment and with encampments around the U.S.

93. As a founding member of Faculty and Staff for Justice in Palestine at Duke University, Plaintiff Rogers believed that her participation in the encampment on UNC's campus was crucial to expressing opinions regarding U.S. foreign policy.

94. During her time at the encampment, Plaintiff Rogers participated in creating art and signs, as well as listening and learning through teach-ins.

95. Plaintiff Rogers also went around the encampment regularly to clean up and ensure that no trash was left on the ground.

96. At no point did Plaintiff Rogers see or hear any encampment participants engaging in property damage or disruptive conduct.

26

97. At no point did Plaintiff Rogers herself engage in any property damage or disruptive conduct.

98. On the morning of April 30, 2024, Plaintiff Rogers awoke to someone announcing that the encampment participants must leave.

99. Approximately fifteen minutes later, Plaintiff Rogers saw the police tearing down the encampment and arresting participants.

100. When the police approached to arrest Plaintiff Rogers, she was holding onto her cane. Plaintiff Rogers informed Defendant Lynch she was not going to resist and asked if she could keep her cane.

101. Defendant Lynch told Plaintiff Rogers she could keep her cane while being arrested, at which point Plaintiff Rogers informed Defendant Lynch she was taking a step forward so he could arrest her.

102. However, another officer, Defendant Lee, said, "Fuck your cane," grabbed the cane from Plaintiff Rogers, and threw her to the ground. Defendant Lee then ordered Defendant Lynch to zip-tied her hands.

103. Plaintiff Rogers sustained injuries due to the excessive force, including a superior labrum tear in her left shoulder and bicep tendonitis.

104. Because of her injury, Plaintiff Rogers was unable to drive herself for several days and had to attend physical therapy and wear a sling for several weeks.

27

105. Plaintiff Rogers was arrested and cited for criminal trespass by Defendant Lynch.

106. Upon information and belief, Defendant Lynch was aware that other police departments had declined to participate in the sweep over concerns that participants were engaging in constitutionally protected activity.

107. Defendant Lynch issued Plaintiff Rogers an indefinite ban from campus on May 3, 2024.[28]

108. Plaintiff Rogers did not receive notice of the possibility of such a ban before it was issued, nor was she given an opportunity to be heard.

109. Students, non-students, and faculty gathered on UNC Chapel Hill's campus later in the day on April 30, 2024, and in the days after the forcible clearing of the encampment to show solidarity with Palestinian lives and liberation, and they have continued to do so. But because of her campus ban, Plaintiff Rogers, despite wanting to join these gatherings, has not been able to.

110. On May 23, 2024, Plaintiff Rogers was invited to speak at an academic event on UNC's campus.

111. On May 24, 2024, Plaintiff Rogers wrote the event organizers and informed them of her ban from campus and offered to give the talk remotely via Zoom.

---

[28] Exhibit G, Campus Ban Notice.

112. On May 30, 2024, Plaintiff Rogers was disinvited from speaking at the event because of her indefinite ban from campus.

113. Plaintiff Rogers has also had to decline invitations to both attend and speak at professional events on UNC Chapel Hill's campus due to her ban.

114. Were she not banned from campus, Plaintiff Rogers would attend and speak at multiple professional obligations and opportunities and would also continue to participate in First Amendment protected activities, such as protesting and gathering with fellow activists in the open, outdoor spaces of UNC Chapel Hill's campus.

115. Although the criminal trespass charge against Plaintiff Rogers has since been dismissed, she remains banned from campus for life.

116. **Plaintiff Laila Dames** is a Palestinian American and a Duke University student.

117. Plaintiff Dames was present and slept at the encampment on April 27, 28, and 29, 2024.

118. Plaintiff Dames attended the encampment to engage in political speech criticizing and raising awareness about the U.S.'s complicity in the Israeli government's genocide of the Palestinian people, petition UNC not to be

complicit in the genocide,[29] take in the speech and expression of other encampment participants, associate with them, and show political solidarity with the encampments around the U.S.

119. As a member of Students for Justice in Palestine at Duke University, and as a Palestinian-American, Plaintiff Dames believed that her participation in the encampment on UNC's campus was crucial to expressing her opinions regarding U.S. foreign policy and engaging in other First Amendment protected activity.

120. During her time at the encampment, Plaintiff Dames participated in group prayer, as well as listening and learning through teach-ins.

121. At no point did Plaintiff Dames see or hear any encampment participants engaging in property damage or disruptive conduct.

122. At no point did Plaintiff Dames herself engage in property damage or disruptive conduct.

---

[29] This viewpoint is informed in part by a report by the United Nations finding that "[t]here are reasonable grounds to believe that the threshold indicating the commission of [] acts of genocide…has been met." Francesca Albanese, Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, Anatomy of a Genocide – Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, U.N. Doc. A/HRC/55/73, at 24 (Mar. 25, 2024) (advance unedited version), https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/sessions-regular/session55/advance-versions/a-hrc-55-73-auv.pdf

123. On the morning of April 30, 2024, Plaintiff Dames was sleeping when the dispersal letter was passed out and was awoken by someone saying that the police were going to begin arresting people.

124. A short time later, Plaintiff Dames saw the police tearing down the encampment and throwing people to the ground.

125. Plaintiff Dames was cited for criminal trespass by Defendant Wylie.

126. During her arrest by Defendant Wylie, Plaintiff Dames suffered bruising and lacerations on her wrists.

127. Upon information and belief, Defendant Wylie was aware other police departments had declined to participate in the sweep over concerns that participants were engaging in constitutionally protected activity.

128. Defendant Wylie issued Plaintiff Dames an indefinite ban from UNC Chapel Hill's campus on April 30, 2024

129. Plaintiff Dames did not receive notice of the possibility of such a ban before it was issued, nor was she given an opportunity to be heard.

130. Due to her immediate ban from campus, Plaintiff Dames was unable to return to campus to retrieve personal items left behind.

131. Students, non-students, and faculty gathered on UNC Chapel Hill's campus later in the day on April 30, 2024, after the forcible clearing of the encampment to show solidarity with Palestinian lives and liberation, and

31

they have continued to do so. Due to her campus ban, Plaintiff Dames has been unable to participate and exercise her First Amendment rights to speech and protest, petitioning the government, receiving ideas and information, and association.

132. Were she not banned, Plaintiff Dames would continue to attend protests and demonstrations and engage in other First Amendment protected activities in the open, outdoor spaces of UNC Chapel Hill's campus.

133. Although the criminal trespass charge against Plaintiff Dames has since been dismissed, she remains banned from campus.

134. **Plaintiff Kathryn Newman** was a student at Meredith College in Raleigh, North Carolina during the encampment.

135. Plaintiff Newman was present and slept at the encampment on April 28 and April 29, 2024.

136. Plaintiff Newman attended the encampment to: engage in political speech criticizing and raising awareness about the U.S.'s complicity in the suffering of the Palestinian people, petition UNC not to be complicit in that suffering, take in the speech and expression of other encampment participants, associate with them, and show political solidarity with the encampments around the U.S.

137. As a member of Students for Justice in Palestine at Meredith College, Plaintiff Newman believed that her participation in the encampment on

32

UNC's campus was crucial to expressing her opinions regarding U.S. foreign policy.

138. Plaintiff Newman is currently employed as an organizer for Voices for Justice in Palestine. Part of her professional obligations include attending protests and rallies in support of Palestinian lives and liberation.

139. During her time at the encampment, she participated in making political art and signs, as well as listening and learning through teach-ins.

140. At no point did Plaintiff Newman see or hear any encampment participants engaging in property damage or disruptive conduct.

141. At no point did Plaintiff Newman herself engage in property damage or disruptive conduct.

142. On the morning of April 30, 2024, Plaintiff Newman was asleep and awoke to someone saying that participants who do not leave within thirty minutes would be arrested.

143. A short time later, Plaintiff Newman saw the police tearing down the encampment and throwing people to the ground.

144. Plaintiff Newman was then arrested and cited for criminal trespass by Defendant Brown.

145. Upon information and belief, Defendant Brown pushed Plaintiff Newman to the ground during her arrest, causing her to hit her and suffer a concussion.

33

146. Upon information and belief, Defendant Brown was aware other police departments had declined to participate in the sweep over concerns that participants were engaging in constitutionally protected activity.

147. Defendant James issued Plaintiff Newman an indefinite ban from UNC Chapel Hill's campus on April 30, 2024.

148. Plaintiff Newman did not receive notice of the possibility of such a ban before it was issued nor was she given an opportunity to be heard.

149. Due to her immediate ban from campus, Plaintiff Newman was unable to retrieve personal items left behind.

150. Plaintiff Newman, who organizes protest actions in support of Palestinian lives and liberation as part of her employment, was immediately prevented from doing so on UNC Chapel Hill's campus.

151. Students, non-students, and faculty gathered on UNC Chapel Hill's campus later in the day on April 30, 2024, after the forcible clearing of the encampment to show solidarity with Palestinian lives and liberation, and they have continued to do so. Because of her campus ban, Plaintiff Newman has been unable to participate and exercise her First Amendment rights to speech and protest, petitioning the government, receiving ideas and information, and association.

34

152. Were she not banned from campus, Plaintiff Newman would continue to participate in First Amendment protected activities in the open outdoor spaces of UNC Chapel Hill's campus.

153. The criminal trespass charge against Plaintiff Newman has since been dismissed, but she remains banned from the UNC campus.

154. **Plaintiff Mathangi Mohanarajah** is an undergraduate student at UNC Chapel Hill. At the time of the encampment, Plaintiff Mohanarajah was taking a semester break from her collegiate studies.

155. Plaintiff Mohanarajah was present at the encampment throughout its duration from April 26-30, 2024.

156. Plaintiff Mohanarajah attended the encampment to engage in political speech criticizing and raising awareness about the ongoing human rights violations in Gaza, petition UNC not to be complicit in those violations, take in the speech and expression of other encampment participants (including non-students), associate with them, and show political solidarity with the encampments being erected around the U.S.

157. As a student at UNC Chapel Hill, Plaintiff Mohanarajah previously attended other protests on UNC Chapel Hill's campus.

158. Plaintiff Mohanarajah did not erect a tent or any other temporary structure.

159. During her time at the encampment, she participated in making political art and signs, as well as listening and learning through teach-ins.

160. At no point did Plaintiff Mohanarajah see or hear any encampment participants engaging in property damage or disruptive conduct.

161. At no point did Plaintiff Mohanarajah herself engage in property damage or disruptive conduct.

162. Plaintiff Mohanarajah was detained with Plaintiffs Dames, Rogers, and Newman and other arrested participants.

163. She was detained for approximately thirty minutes before being released without criminal citation.

164. Although Plaintiff Mohanarajah was not criminally cited following her detention, she still received a ban from campus and a suspension from the University through its EEAC without a hearing or any form of process.

165. Plaintiff Mohanarajah did not receive notice that a ban from campus could result from her participation in the encampment.

166. UNC university policies require, at minimum, that students receive notice and an opportunity for a hearing.[30]

---

[30] The UNC Policy Manual, *Policy on Minimum Substantive and Procedural Standards for Student Disciplinary Proceedings*, 700.4.1, https://www.north-carolina.edu/apps/policy/doc.php?type=pdf&id=832.

167. The EEAC's action against Plaintiff Mohanarajah is atypical—it is otherwise customary to refer students in violation of UNC's "Instrument of Student Judicial Governance" to the student-led Honor Court.

168. The EEAC's letter to Plaintiff Mohanarajah informing her of her immediate and indefinite suspension stated the basis for this suspension was her "cit[ation] for 2nd degree trespassing," and the "issu[ance] of a University Trespass on April 30, 2024, in Polk Place after law enforcement officers ordered you and others to disperse and you allegedly failed to comply with that order."

169. Plaintiff Mohanarajah was never criminally charged for second-degree trespass.

170. The reasons stated in the EEAC letter to Plaintiff Mohanarajah do not fall under any of the five categories enumerating the EEAC's responsibilities. The categories make clear that the EEAC process is intended to be utilized for incidents involving imminent threats of violence, not protests.

171. On October 31, 2024, Ms. Mohanarajah received a letter from the EEAC declaring her suspension had been lifted.

172. Until UNC lifted her suspension, Plaintiff Mohanarajah had remained suspended and banned from campus for over six months, without a hearing.

173. Plaintiff Mohanarajah was unable to re-enroll in classes while she was suspended, and her graduation date was further delayed.

37

174. Defendants Desiree Rieckenberg, Cpt. Rasheem Holland, and Jennifer Spangenberg are listed as the signatories on Ms. Mohanarajah's EEAC letter.

175. Ms. Mohanarajah remains partially banned from campus. Per a letter from Defendant James December 6, 2024. Ms. Mohanarajah must notify and seek permission from Defendant James for campus-based activities, including classes, on a case-by-case basis, notwithstanding the lifting of her suspension.

176. There are currently no online courses at UNC available to Plaintiff Mohanarajah.

177. Were she not banned from campus, Plaintiff Mohanarajah would continue to participate in First Amendment protected activities in the open, outdoor spaces of UNC Chapel Hill's campus.

178. **Plaintiff Anshu Shah** is an undergraduate student at UNC Chapel Hill expected to graduate in May 2025.

179. At the time of the encampment, Plaintiff Shah was a member of UNC SJP.

180. Plaintiff Shah was present at the encampment on April 26, 27, 28 and 30, 2024. He slept at the encampment on Friday, April 26, and Sunday, April 29, 2024.

38

181. Plaintiff Shah attended the encampment to: engage in political speech criticizing and raising awareness about the U.S.'s complicity in war crimes, petition UNC not to be complicit in those war crimes, take in the speech and expression of other encampment participants (including non-students), associate with them, and show political solidarity with encampments around the U.S.

182. During his time at the encampment, he took part in prayers with Muslim participants, shared seder with Jewish participants, created art and signs, and attended teach-ins.

183. At no point did Plaintiff Shah see or hear any encampment participants engaging in property damage or disruptive conduct.

184. At no point did Plaintiff Shah himself engage in property damage or disruptive conduct.

185. On the morning of April 30, 2024, Plaintiff Shah saw a UNC Chapel Hill administrator handing a letter to a participant.

186. Shortly thereafter, Plaintiff Shah saw the police tearing down the encampment and arresting participants.

187. Plaintiff Shah moved a short distance away from the encampment but could see his friends and colleagues getting thrown around by the police and having their belongings trampled on.

39

188. Plaintiff Shah felt frightened as he watched the police fill out trucks with his arrested fellow encampment participants.

189. Before the encampment, and until the arrests that occurred on April 30, 2024, Shah was part of UNC SJP's leadership. Due to his fear after witnessing the forcible clearing of the encampment, Shah removed himself from UNC SJP's leadership before the Fall 2024 semester.

190. Since the forcible clearing of the encampment, Plaintiff Shah has been hesitant to exercise his First Amendment rights on campus out of fear of retaliation by the university official defendants.

191. Plaintiff Shah has opted not to attend several protests and demonstrations in support of Palestinian lives and liberation on campus out of fear of retaliation by the university official defendants.

UNC Chapel Hill Police Uphold Bans

192. Plaintiffs Rogers, Dames, Mohanarajah and Newman's only opportunity to be heard and challenge their campus bans was via timely appeal within the ten-day appeal process outlined in the letters they received informing them of their bans.

193. The "appeal process" consisted of Defendant Chief Brian James meeting with Plaintiffs' counsel to discuss whether he intended to uphold the ban.

194. The appeal is entirely under the discretion of Defendant James, who issued the bans in the first place.

195. Defendant James upheld the indefinite bans of Plaintiffs Rogers, Dames, and Newman, the only exception being UNC Hospital's Emergency Department for emergency medical care. They can petition for reconsideration in two years.

196. On December 6, 2024, Defendant James modified Plaintiff Mohanarajah's ban to restrict her presence on campus except when "necessary" and contingent upon notifying him beforehand of the specific location where she plans to be.

197. These bans extend to UNC medical offices.

198. Plaintiff Mohanarajah is a resident of Chapel Hill and has sought medical treatment on UNC Chapel Hill's campus and at UNC Hospital in the past.

199. The terms of her ban require her to notify and seek permission on a case-by-case basis from Defendant James before obtaining treatment at UNC medical offices.

200. Because of these restrictions, Plaintiff Mohanarajah has had to make other arrangements to retrieve the prescribed medications she previously received on UNC's campus.

41

201. Plaintiff Mohanarajah wishes to seek routine medical care and prescriptions on campus upon her re-enrollment at UNC without being subject to related case-by-case, discretionary decisions from Defendant James.

202. Plaintiff Rogers is a Duke University professor and cannot pursue professional opportunities on UNC Chapel Hill's campus because of her campus ban.

203. Plaintiff Dames is an undergraduate student at Duke University and is eligible to and desires to take classes at UNC per the University's inter-institutional agreement with Duke but cannot because of her ban from UNC's campus.

204. Plaintiff Newman is an organizer for Voices for Justice in Palestine and is required to organize and attend protests and demonstrations in support of Palestinian lives and liberation but cannot attend any on UNC's campus because of her ban.

205. Though Plaintiffs Mohanarajah, Rogers, Dames, and Newman continue to support Palestinian lives and liberation, they cannot gather and associate with others for the purpose of First Amendment protected activity on the UNC campus.

206. Plaintiffs Dames, Rogers, and Newman have a liberty interest in accessing public fora like the open green spaces of UNC's campus. Their bans from campus interfere with this interest.

42

207. Plaintiff Mohanarajah has a property interest in obtaining an education and accessing UNC's campus resources that are generally available to students and a liberty interest in accessing public fora. Her ban from campus interferes with these interests.

Other Encampment Participants' Outcomes

208. On Friday, December 13, 2024, one of the approximately forty individuals arrested went to trial for a second-degree trespassing arrest that allegedly occurred on April 30, 2024, during the police sweep of the encampment.

209. At the conclusion of the prosecution's case, the individual's attorneys made a motion to dismiss for lack of evidence. Counsel argued the Orange County prosecutor had not produced evidence that the individual's presence in a public forum violated any reasonable time, place, and manner restrictions.

210. Judge Cabe granted the motion and orally found the individual was engaging in protected activity in a public forum and that the prosecution had not produced evidence proving UNC's revocation of its authorization for the individual to be in that public forum was valid and constitutional.[31]

211. The Orange County District Attorney's Office has since dismissed all remaining trespass cases related to the April 2024 encampment.

**Other Student Protests at UNC Chapel Hill**

---

[31] Exhibit H, Judge Cabe Court Order.

43

212. UNC Chapel Hill has a long history of student protest movements on campus. None have resulted in UNC officials responding as punitively as they did against Plaintiffs here.

213. The following allegations related to other protests at UNC Chapel Hill are made upon information and belief.

Speaker Ban Protests

214. In 1963, hundreds of UNC Chapel Hill students gathered on McCorkle Place,[32] another open, grassy quadrangle on the University's campus similar to Polk Place, to protest a recently passed law that prohibited speakers who were members of the Communist Party or who had pled the Fifth Amendment when questioned in connection with alleged subversive activities from speaking on campus.[33]

---

[32] *Speaker Ban Law Passes, Protests Ensue*, University of South Carolina, June 26, 1963, https://scalar.usc.edu/works/english-and-comparative-literature-225-anniversary-timeline/1963-june-26---speaker-ban-law-passes-protests-ensue

[33] *CUNC Against Speaker Ban*, The Daily Tar Heel, June 27, 1963 pp. 1, 9, https://newspapers.digitalnc.org/lccn/sn92073228/1963-06-27/ed-1/seq-1/

44



215. Students gathered on the grass of McCorkle Place, staged sit-ins, and blocked building entrances.

216. UNC Chapel Hill officials and faculty openly repudiated the law, and the Faculty Council passed a unanimous resolution against it.[34]

217. The UNC Chapel Hill chapter of Students for a Democratic Society began inviting communist speakers to campus who were specifically barred under the law.[35]

218. Student government, the *Daily Tar Heel*, the Carolina Forum, the Campus Y, the Di-Phi, the Carolina Political Union, and the Order of the Golden Fleece all supported the speaker invitations, and the student body

---

[34] *Id.*

[35] The Speaker Ban Law at Carolina, *Students for a Democratic Society*, https://museum.unc.edu/exhibits/show/speaker-ban-law/students-for-a-democratic-soci.

45

president met regularly with the University President to discuss ways to protest this new law.[36]

219. There are no publicly available reports of students or non-students facing any criminal or university disciplinary repercussions, including campus bans, for their participation in the protest.

220. There are also no publicly available reports indicating that the UNC Chapel Hill chapter of Students for a Democratic Society faced disciplinary repercussions or revocation of their student organization status for inviting speakers specifically barred by the Speaker Ban.

Vietnam War Protests

221. In the late 1960s, UNC students were involved in several anti-Vietnam War protests.

222. In February 1967, approximately 35 students picketed outside Memorial Hall, which abuts Polk Place, without incident.[37]

---

[36] The Speaker Ban Law at Carolina, *Students Mobilize*, https://museum.unc.edu/exhibits/show/speaker-ban-law/students-mobilize.

[37] I Raise My Hand To Volunteer, *Part 4: Vietnam War Protests*, https://exhibits.lib.unc.edu/exhibits/show/protest/vietnam-essay.



223. On March 18, 1968, fifteen student protestors were arrested for blocking the entrance to Gardner Hall, which abuts Polk Place, to protest Dow Chemical, the maker of napalm.[38]

224. There are no publicly available reports indicating that these students faced any university disciplinary action, including campus bans.

225. In response to the increase in student protests on campus in the 1960s, the UNC Board of Trustees adopted a new policy regarding disruptions on campus.[39]

226. The policy protected the "right of free discussion and expression, peaceful picketing and demonstrations, [and] the right to petition and

---

[38] *Id.*

[39] University Archives at the Louis Round Wilson Special Collections Library, *Campus Disruption (Student Unrest): Disruptive Conduct: General, 1969-1970*, https://dc.lib.unc.edu/cdm/singleitem/collection/uars/id/71024.

47

peaceably assemble" while prohibiting "willful disruption of the educational process, destruction of property, and interference with the rights of other members of the community."[40]

227.  On May 6, 1970, UNC Chapel Hill student body president Tommy Bello organized a mass student gathering on Polk Place to protest the United States' invasion of Cambodia, urging students to boycott their classes and remain nonviolent.[41]

228.  Approximately four thousand students protested outside Hill Hall, which abuts McCorkle Place,[42] loudly chanting while faculty passed a resolution allowing professors to make individualized arrangements with students with regards to their coursework.[43]

229.  The majority of the protest remained nonviolent, but red paint was splashed on some university buildings, and some windowpanes were broken.[44]

---

[40] I Raise My Hand To Volunteer, *Part 4: Vietnam War Protests*.

[41] *Id.*

[42] McCorkle Place measures approximately 900 feet in length, and 200 feet in width. *Supra* note 5 at 8.

[43] I Raise My Hand To Volunteer, *Part 4: Vietnam War Protests*.

[44] *Id.*

48

230. There are no publicly available reports of students or non-students facing any criminal or university disciplinary repercussions, including campus bans, for their participation in these protests on campus.

Food Worker Strikes

231. In 1968, members of the Black Student Movement protested food worker conditions by supporting striking workers, picketing Lenoir Hall, located just behind Bingham and Greenlaw Halls, which abut Polk Place, and boycotting the dining facility, before ultimately overturning dining tables and occupying Manning Hall, which abuts Polk Place.[45]

232. Notably, UNC Chapel Hill administrators intended to negotiate with students, but then North Carolina Governor Scott sent four National Guard units to Durham and five riot-trained Highway Patrol units to campus.[46]

233. At the governor's direction, Chapel Hill police arrested the Black Student Movement students who refused to leave the building.[47]

---

[45] I Raised My Hand To Volunteer, *Part 3: The BSM and the Foodworkers' Strike*, https://exhibits.lib.unc.edu/exhibits/show/protest/foodworker-essay.

[46] *Id.*

[47] *Id.*

Case 1:25-cv-00191-TDS-JGM    Document 1    Filed 03/11/25    Page 49 of 77

234. In December 1969, three Black Student Movement members were cited with University disruption violations for their participation in the protest at Lenoir Hall.[48]

235. In March 1970, four Black students were found in violation of the new policy, and two of those students were criminally charged.[49]

236. On May 5, 1970, over 2,000 UNC Chapel Hill students marched through campus in support of the students found guilty of violating the disruptions policy.

237. On May 7, 1970, around 450 students signed a petition to the University administration, each attesting that they had willfully violated the disruptions policy.

238. By August 1970, the criminal cases against the Black Student Movement students were closed, and they were told "no adverse entry" had been made in their university records.[50]

---

[48] Gray, Rick, *3 Black Students Charged with Disruption Violation*, The Daily Tar Heel, April 3, 1970, https://newspapers.digitalnc.org/lccn/sn92073228/1970-04-03/ed-1/seq-1/#words=David+Blevins.

[49] Sydnie Martin, *The 1969 Disruption Policy during the Vietnam War Era*, For the Record (Dec. 2, 2024), https://blogs.lib.unc.edu/uarms/2024/12/02/the-1969-disruption-policy-during-the-vietnam-war-era/.

[50] *Id*.

239.  Also in August 1970, the disruptions policy adopted in response to Vietnam War student protests was changed to prohibit only "destruction of university property or other acts of physical violence," as opposed to the prior, more encompassing prohibition of disruptions to the educational process.[51]

240.  Fewer than ten individuals were cited for violating the original disruptions policy.[52]

241.  There are no publicly available reports of any individuals, including those cited for violating the disruptions policy, having been banned from campus.

Anti-Apartheid Protests

242.  On March 18, 1986, students protesting South Africa's system of apartheid constructed an encampment in front of South Building, which abuts Polk Place.[53]

---

[51] Nowell, Bobby, *Disruptions Clarified; Trustees Vote in Fall*, The Daily Tar Heel, August 13, 1970, https://newspapers.digitalnc.org/lccn/sn92073228/1970-08-13/ed-1/seq-1/#words=disruptions+policy.

[52] Plaisance, Steve, *Fewer Than Ten Cited In Strike Disruptions*, The Daily Tar Heel, June 11, 1970, https://newspapers.digitalnc.org/lccn/sn92073228/1970-06-11/ed-1/seq-1/.

[53] Nicholas Graham, *Timeline of 1980s Anti-Apartheid Activism at UNC*, For the Record, University Archives (May 15, 2017), https://blogs.lib.unc.edu/uarms/2017/05/15/timeline-of-1980s-anti-apartheid-activism-at-unc/

51

243. UNC Chapel Hill police dismantled the encampment, but they were soon rebuilt with permission from the Chancellor.[54]

244. Two weeks later, counter-protestors constructed a "Berlin-type wall" in objection to the continued presence of the encampment.[55]

245. On April 14, 1986, after the University voted against complete divestment from South African related holdings, students staged a sit-in and marched through campus and downtown Chapel Hill.[56]

246. Then UNC Chapel Hill Chancellor Fordham supported divestment.

247. The following fall, the University voted to completely divest.[57]

248. There are no publicly available reports that students or non-students involved in any of the protests faced criminal charges or disciplinary repercussions, including campus bans for their involvement.

<u>Labor Movement Demonstrations</u>

249. Around April 2008, student members of Student Action with Workers set up a table in Polk Place to highlight accounts of illegal work

---

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

52

conditions in the garment industry and to protest UNC Chapel Hill's sale of merchandise produced in sweatshop labor conditions.[58]

250.  These students were not told to vacate Polk Place, nor were they told that they could not set up a table.

251.  UNC Chapel Hill officials did not initiate arrests or summarily suspend these students without hearings or due process.

252.  University officials did not forcefully clear the temporary structures set up as a part of this protest.

253.  There are no publicly available reports of students or non-students involved facing any criminal or disciplinary action, including campus bans.

Individual Speaker Protests

254.  On April 14, 2009, multiple UNC Chapel Hill student groups staged protests at Bingham Hall where U.S. Representative Tom Tancredo was scheduled to speak.[59]

---

[58] *Students protest UNC's sweatshop involvement*, The Daily Tarheel (April 11, 2008), https://www.dailytarheel.com/search/?a=1&au=David+Gilmore&ty=article&o=date

[59] *Tancredo Shut Down; Police Tangle With Protestors*, Carolina Alumni Review (April 16, 2009), https://alumni.unc.edu/news/tancredo-shut-down-police-tangle-with-protesters/.

Case 1:25-cv-00191-TDS-JGM    Document 1    Filed 03/11/25    Page 53 of 77

255. Protestors gathered both outside the building and in the room where Representative Tancredo was supposed to speak.[60]

256. At some point while Representative Tancredo was speaking, a brick was thrown through one of the classroom windows.[61]

257. UNC Chapel Hill Police issued verbal commands to the protestors to disperse and used pepper spray on those who did not do so.[62]

258. Students involved in the protest faced Honor Court investigations and at least one student was arrested and charged with disorderly conduct.[63]

259. One week later, former Representative Virgil Goode came to UNC Chapel Hill's campus and the same student was again arrested for protesting Goode's speaking engagement.[64]

260. There are no publicly available reports this student faced university disciplinary repercussions following her arrests.

261. There are no publicly available reports indicating that involved students or non-students were issued indefinite campus bans.

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Prosecution Deferred in Protest Cases*, Carolina Alumni Review (June 2, 2009), https://alumni.unc.edu/news/prosecution-deferred-in-protest-cases/.

54

<u>Silent Sam Protests</u>

262.    Over the course of the 2017-2018 academic year, students staged a number of protests demanding UNC Chapel Hill remove the Confederate monument known as Silent Sam from McCorkle Place.[65]

263.    On August 23, 2017, a protest of approximately 1,000 students and non-students gathered on McCorkle Place to protest the monument.[66]

264.    Police barricaded and surrounded the statue, and three individuals, including one student, were arrested.[67]

265.    After this protest, students organized groups to camp and maintain a continuous presence at the statute.[68]

---

[65] This was by no means the first time the monument's presence on campus had been protested by students. As early as 2015 the monument had been vandalized multiple times. Dakota Moyer, *Silent Sam: A Timeline*, Chapelboro.com (Aug. 20, 2019), https://chapelboro.com/news/unc/silent-sam-timeline-confederate-monument-unc-chapel-hill

[66] Dakota Moyer, *Silent Sam: A Timeline*, Chapelboro.com (Aug. 20, 2019), https://chapelboro.com/news/unc/silent-sam-timeline-confederate-monument-unc-chapel-hill.

[67] *3 face charges at UNC confederate statue protest*, Associated Press (Aug. 23, 2017), https://wlos.com/news/local/3-face-charges-at-unc-confederate-statue-protest.

[68] Moyer, *Silent Sam: A Timeline.*

266. On September 1, 2017, campus police removed all items at the encampment that were not being physically held onto by students, and protestors and claimed they were in violation of the University's facilities use policy.[69]

267. No protestors were arrested at this time, and the students involved were not summarily suspended from the University, nor were the students dispersed.

268. On April 30, 2019, a UNC Chapel Hill graduate student organized a protest and defaced the statue with their own blood.[70]

269. The student was arrested and charged with defacing a public monument and appeared before UNC Chapel Hill's Honor Court to face University disciplinary charges.[71]

270. Despite the property damage allegations and felony criminal charges, this student was not summarily suspended through the EEAC without a hearing or due process.

---

[69] Blake Hodge, *UNC Police Remove Items from Silen Samt Protest*, Chapelboro.com (Sept. 1, 2017), https://chapelboro.com/news/unc/unc-police-remove-items-silent-sam-protest.

[70] Joseph Baldoni Karlik, *Solidarity protects anti-racist activist Maya Little from legal, academic punishment*, Liberation (Oct. 31, 2018), https://www.liberationnews.org/maya-little-goes-before-uncs-unjust-honor-court/

[71] *Id.*

271. On August 20, 2018, protestors at McCorkle Place physically toppled the Silent Sam statue.[72]

272. Seven individuals, none of whom were affiliated with the University, were arrested during the protest.[73]

273. Three individuals, all non-students, were arrested in connection with toppling the statue.[74]

274. No one arrested in connection with the Silent Sam protests was summarily and permanently trespassed from all UNC Chapel Hill property.

## CLAIMS FOR RELIEF

### Count I

### First Amendment to the U.S. Constitution, via 42 U.S.C. § 1983
### Prior Restraint

*Plaintiffs Dames, Rogers, Newman, and Mohanarajah against University Defendants in both their individual and official capacities*

---

[72] Alan Blinder and Jesse James Deconto, *'Silent Sam' Confederate Statue Is Toppled at University of North Carolina*, New York Times (Aug. 21, 2018), https://www.nytimes.com/2018/08/21/us/unc-silent-sam-monument-toppled.html

[73] Janine Bowen and Bryan Mims, *Seven arrested at protest on UNC campus; 3 accused of toppling Silent Sam formally charged*, WRAL (Aug. 25, 2018), https://www.wral.com/story/seven-arrested-at-protest-on-unc-campus-3-accused-of-toppling-silent-sam-formally-charged/17795743/

[74] *Id.*

57

275. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

276. Any system of prior restraint bears "a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

277. To overcome the presumption of invalidity, a prior restraint must "contain precise criteria sufficiently spelling out what is forbidden so that a reasonable intelligent [person]" will be on notice. *Baughman v. Freienmuth*, 478 F. 2d 1345, 1351 (4th Cir. 1973).

278. The U.S. Supreme Court has repeatedly held that a prior restraint "contingent upon the uncontrolled will of an official" and which "may be granted or withheld in the discretion of such official" is "unconstitutional censorship." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151-52 (1969) (internal citations omitted).

279. Systems of prior restraint are subject to strict scrutiny review and must be "narrow, objective, and [have] reasonable standards." *Id.* at 1350. The prior restraints created by the campus bans do not meet this standard.

280. Plaintiff Mohanarajah wishes to engage in political speech and associational activity on UNC Chapel Hill's campus.

281. University Defendants have banned Plaintiff Mohanarajah from campus and require her to contact UNC Police by email to notify them of her

58

"necessary presence on campus" and the location of her intended presence before setting foot on campus.

282. The only reasoning that Defendants Rieckenberg, Holland, and Spangenberg provided Plaintiff Mohanarajah for her ban is the false assertion that she was arrested for trespassing and a vague assertion that she violated an unspecified policy.

283. Plaintiff Mohanarajah has made at least three attempts to have her ban lifted, to no avail.

284. Plaintiffs Rogers, Dames, and Newman wish to engage in political speech and associational activity on UNC Chapel Hill's campus.

285. University Defendants have imposed indefinite campus bans on Plaintiffs Rogers, Dames, and Newman, requiring they re-petition for access every two years. Defendant James has discretion to decide whether to modify or rescind these Plaintiffs bans but has not done either.

286. The only opportunity Plaintiffs Rogers, Dames, and Newman were afforded to challenge their bans was an appeal over which Defendant James had complete discretion.

287. Defendant Roberts has not issued clear, publicly available guidance or limitations on Defendant James' exercise of discretion in imposing, modifying, or rescinding indefinite campus bans.

59

288. The only reasoning Defendant James has provided Plaintiffs Dames, Rogers, and Newman for their bans is a vague assertion that they violated an unspecified policy and were arrested for trespassing.

289. Any University policies that may have been violated were not reasonable time, place and manner restrictions as applied to the protest.

290. By banning Plaintiffs Dames, Rogers, Newman, and Mohanarakah from campus and restricting their return, University Defendants created a prior restraint on Plaintiffs' constitutionally protected interests in speech and expression, petitioning the government, receiving ideas and information, and associating with others.

291. University Defendants' decision to disperse the encampment was not a narrowly tailored restriction on association that serves a compelling or substantial government interest.

292. That maintenance of these campus bans is subject to the "uncontrolled will" of Defendant James amounts to unconstitutional censorship.

## COUNT II

### First Amendment to the U.S. Constitution, via 42 U.S.C. § 1983
### Freedom of Association

*All Plaintiffs against all Defendants*
*individually and University Defendants in their official capacities*

293. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

60

294. The First Amendment protects the fundamental right to associate with others for the purpose of collective activity and peaceable assembly. The U.S. Supreme Court "has recognized a right to associate for the purpose of engaging" in "speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984.)

295. This protection is so vital that it extends beyond outright prohibitions on association: the First Amendment also prohibits indirect government action that chills, discourages, or substantially burdens association. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021).

296. Plaintiffs were engaged in protected associational activity in a traditional public forum while participating in the encampment in solidarity with Palestine, including social, political, and religious programming, art making, demonstrating nonviolently, and associating with likeminded students and non-students.

297. A traditional public forum is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

298. Polk Place "possesses many of the characteristics of a public forum." *Widmar v. Vincent*. 454 U.S. 263, 267 n. 5 (1981). The Supreme Court has drawn an analogy between an "open campus lawn" and "a traditional public forum" like municipal parks. *Id.*

61

299. Additionally, Defendant Roberts has made it clear that he views Polk Place and other outdoor quadrangle areas on campus as "open to all regardless of their views" and their status as a student or non-student.[75]

300. Because Polk Place is a traditional public forum, University Defendants' restrictions on Plaintiffs' speech and associational activity must satisfy strict scrutiny and be narrowly tailored to serve a compelling government interest and provide an ample alternative channel of communication. They do not meet this stringent test.

301. University Defendants' decision to disperse the encampment was not a narrowly tailored restriction on association that serves a compelling or substantial government interest.

302. Officer Defendants' oral command to disperse when they had no reason to believe disorderly conduct was occurring was an unlawful order prohibiting Plaintiffs from engaging in First Amendment protected activity.

303. Officer Defendants' oral command to disperse the encampment was not a narrowly tailored restriction on speech serving a compelling government interest and did not provide adequate alternative channel of association.

[75] Exhibit A.

304. University Defendants' suspensions and Officer Defendants' arrests directly and substantially burdened Plaintiffs' ability to associate freely with likeminded individuals.

305. As a direct and proximate result of University Defendants' and Officer Defendants' actions, Plaintiffs were prohibited from engaging in constitutionally protected activity in a public forum.

## <u>Count III</u>

### First Amendment to the U.S. Constitution, via 42 U.S.C. § 1983
### Viewpoint Discrimination

*All Plaintiffs against University Defendants*
*in both their individual and official capacities*

306. Plaintiffs reallege and incorporate all preceding paragraphs as though fully set forth herein.

307. University Defendants engaged in viewpoint discrimination by singling out Plaintiffs engaged in the non-disruptive encampment based on the viewpoints they expressed in support of Palestinian lives and freedom.

308. Past student protest movements expressing other viewpoints were not met with the same degree of hostility by the University, even those that resulted in significant property damage.

63

309. "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberg v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

310. Even if Polk Place were not a traditional public forum, universities cannot engage in "viewpoint discrimination, even when the limited public forum is one of [their] own creation." *Id.* at 829. Restrictions on speech must "burden no more speech than necessary to serve a significant government goal." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

311. By forcibly clearing the nondisruptive encampment, summarily suspending and trespassing students, and banishing non-students for their participation, University Defendants engaged in unconstitutional viewpoint discrimination in violation of the First Amendment.

312. University Defendants' decision to disperse Plaintiffs from Polk Place and failure to provide adequate alternative means for communication do not advance any legitimate government interest in a narrowly tailored way.

313. Additionally, University Defendants' actions were significantly more punitive than they have been against past protesters who engaged in the same or similar conduct but expressed other viewpoints.

314. As a result of University Defendants' actions amounting to content and viewpoint discrimination, Plaintiffs suffered and continue to suffer irreparable harm to their First Amendment protected interests in speech and

64

expression, petitioning the government, receiving ideas and information, and association.

**<u>Count IV</u>**

**First Amendment to the U.S. Constitution, via 42 U.S.C. § 1983
Retaliation Against Protected Speech**

*Plaintiffs Dames, Rogers, Newman, and Mohanarajah against University Defendants in both their individual and official capacities*

315.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

316.  "The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000).

317.  As outlined in Count II, Plaintiffs were engaged in protected speech activity in a public forum.

318.  University Defendants' immediate issuance of indefinite bans from all UNC Chapel Hill property to Plaintiffs Dames, Rogers, Newman, and Mohanarajah adversely affected their First Amendment rights to engage in political speech and association in a public forum.

319.  University Defendants' immediate and summary suspension of Plaintiff Mohanarajah through the EEAC at UNC Chapel Hill was an adverse

65

action that chilled Plaintiff Mohanarajah's ability to engage in protected activity in a public forum.

320. University Defendants' disciplinary actions were substantially motivated by Plaintiffs Dames, Rogers, Newman, and Mohanarajah's protected speech and associational activity.

321. As a result of University Defendants' actions, Plaintiffs' Dames, Rogers, Newman, and Mohanarajah have been chilled out of fear of retaliation from future exercise of their constitutionally protected rights of free speech and expression, petitioning the government, receiving ideas and information, and association.

### Count V

### Fourteenth Amendment to the U.S. Constitution, via 42 U.S.C. § 1983 Procedural Due Process

*Plaintiffs Dames, Rogers, Newman, and Mohanarajah against University Defendants in their individual and official capacities*

322. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

323. University Defendants violated Plaintiffs Dames, Rogers, Newman, and Mohanarajah's rights to procedural due process under the Fourteenth Amendment by summarily suspending and/or banning them from campus without first providing meaningful notice and an opportunity to be heard.

66

324. University Defendants' actions infringed upon Plaintiff Mohanarajah's property and liberty interests in obtaining a public education. *See Goss v. Lopez,* 419 U.S. 565, 574–75 (1975) ("[A] student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property.").

325. University Defendants' actions infringed upon Plaintiffs Dames, Rogers, Newman, and Mohanarajah's liberty interest in accessing public property. *City of Chicago v. Morales*, 527 U.S. 41, 54 (1999).

326. University Defendants' failed to provide sufficient notice that Plaintiffs Dames, Rogers, and Newman were to disperse or face arrest.

327. University Defendants' failed to provide sufficient notice that failure to disperse from the encampment would result in banishments from campus.

328. University Defendants also summarily suspended and banned Plaintiffs Dames, Rogers, Newman, and Mohanarajah from campus without providing an opportunity to be heard.

329. Plaintiffs Dames, Rogers, Newman, and Mohanarajah suffered immediate, erroneous loss of property and liberty interests.

330. Plaintiff Mohanarajah remained suspended from the University without a hearing for six months.

67

331. Plaintiff Rogers was uninvited from a professional speaking opportunity due to her immediate ban.

332. Plaintiffs Dames and Newman were unable to retrieve personal items left behind at the encampment due to their immediate bans.

333. The ease with which post-deprivation hearings were arranged shows a prompt pre-deprivation hearing was practicable and not fiscally burdensome.

## Count VI

### Fourth Amendment to the U.S. Constitution, via 42 U.S.C. § 1983
### Unlawful Arrest

*Plaintiffs Dames, Newman, and Rogers against Defendants Wylie, Brown, Lee, and Lynch, in their individual capacities*

334. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

335. Defendant Officers' issuance of a command to disperse when they had no reason to believe disorderly conduct was occurring was an unlawful order that prohibited Plaintiffs from engaging in First Amendment protected activity.

336. Defendants Wylie, Brown, Lee, and Lynch unlawfully arrested Plaintiffs Dames, Newman, and Rogers, respectively, without probable cause to believe they had committed any crime.

68

337. Defendants Wylie, Brown, Lee, and Lynch had fair notice that their decisions to arrest Plaintiffs Dames, Newman, and Rogers while they were engaging in protected speech in a public forum, and when they lacked probable cause to believe that Plaintiffs were engaged in criminal activity, were objectively unreasonable.

## Count VII

### Fourth Amendment to the U.S. Constitution, via 42 U.S.C. § 1983 Excessive Force

*Plaintiff Rogers Against Defendant Lee*
*in his individual capacity*

338. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

339. "Determining whether the force used to affect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *United States v. Place,* 462 U.S. 696, 703 (1983)).

340. When evaluating whether the force used to effectuate an arrest was excessive, courts examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

69

actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396.

341. Plaintiff Rogers uses a cane to assist with walking due to a disability.

342. At the time Defendant Lee participated in the arrest of Plaintiff Rogers, she posed no immediate safety threat to herself, the officer, or others.

343. At the time Defendant Lee participated in the arrest of Plaintiff Rogers, she was not actively resisting or trying to evade arrest by flight.

344. Plaintiff Rogers was arrested for a nonviolent, Class 3 misdemeanor—the lowest level misdemeanor in North Carolina.

345. Despite these facts, Defendant Lee threw Plaintiff Rogers to the ground unnecessarily, took away her cane, and dragged her over the ground.

346. Plaintiff Rogers suffered a torn superior labrum in her left shoulder and bicep tendonitis. She had to seek medical attention as a direct and proximate result of Defendant Lee's conduct.

## Count VIII

### Article I, Sec. 14 of the North Carolina Constitution

*All Plaintiffs Against University Defendants*
*in their official capacities*

347. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

70

348. The North Carolina Supreme Court "has recognized a direct action under the State Constitution against state officials for violation of rights guaranteed by the Declaration of Rights." *Corum v. Univ. of N. Carolina Through Bd. of Governors*, 413 S.E.2d 276, 290 (N.C. 1992).

349. When there is no remedy available, North Carolina common law "guarantees plaintiff a direct action under the State Constitution for alleged violations of his constitutional freedom of speech rights." *Id.*

350. University Defendants violated Plaintiffs' free speech rights under Article I, § 14 of the North Carolina Constitution when they prohibited and arrested them from engaging in protected speech activity in a public forum.

351. Article I, Section 14 of the North Carolina Constitution provides at least the same level of protection of speech as the First Amendment to the U.S. Constitution. *See State v. Jackson* 348 N.C. 644, 648 (1998).

352. Plaintiffs lack an adequate state law remedy to recover for a violation of their state constitutional rights to free speech and expression, petitioning the government, receiving information and ideas, and association.

353. For the same reasons articulated in counts I-IV, University Defendants' actions violate Plaintiffs' rights under Article I, Section 14 of the North Carolina Constitution.

## Count IX

### Article I, Sec. 19 of the North Carolina Constitution

71

354. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth here.

355. Article I, Section 19 of the North Carolina constitution provides: "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land."

356. Article I, Section 19 provides at least the same level of due process as the Fourteenth Amendment.

357. Plaintiffs Dames, Rogers, Newman, and Mohanarajah lack an adequate state common law or statutory remedy to recover for a violation of their state constitutional rights to due process.

358. For the same reasons articulated in count V, Defendants University officials' actions violate Plaintiffs Dames, Rogers, Mohanarajah, and Newman's rights under Article I, Section 19 of the North Carolina constitution.

## Count X

### Battery

*Plaintiffs Newman, Dames, and Rogers Against Defendants Brown, Wylie, Lee, and Lynch in their individual capacities*

72

359. All preceding paragraphs are incorporated as if fully set out herein.

360. "The interest protected by the action for battery is freedom from intentional and unpermitted contact with one's person[.]" *Dickens v. Puryear*, 276 S.E.2d 325, 330 (N.C. 1981).

361. Defendants Wiley, Brown, Lee and Lynch made intentional and unpermitted physical contact with Plaintiffs Dames, Newman, and Rogers, respectively, which caused Plaintiffs injury.

362. Defendant Wylie's arrest of Plaintiff Dames caused bruising and lacerations around her wrists.

363. Defendant Brown pushed Plaintiff Newman to the ground, causing her to hit her head and suffer a concussion.

364. Defendants Lynch and Lee's actions during the arrest of Plaintiff Rogers caused a superior labrum tear and bicep tendonitis in her left shoulder. Plaintiff Rogers was unable to drive for several days and her injuries required weeks of physical therapy.

365. Defendants acted wantonly, contrary to their duty, and with intent to injure Plaintiffs.

### Count XI

### Unlawful Arrest

73

*Plaintiffs Newman, Dames, and Rogers Against Defendants Brown, Wylie, Lee, and Lynch in their individual capacities*

366. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

367. Defendants Wylie, Brown, Lee, and Lynch unlawfully arrested Plaintiffs Newman, Dames, and Rogers, respectively, for failure to comply with an unlawful order to disperse and without probable cause to believe they had committed any crime.

368. "False imprisonment is the illegal restraint of a person against their will. A restraint is illegal if it is not lawful or consented to. A false arrest is one without legal authority and is one means of committing false imprisonment." *Marlowe v. Piner*, 119 N.C. App. 125, 129 (1995) (citations omitted).

369. Officers may initiate an arrest without a warrant if the officer has probable cause to believe the individual has committed a criminal offense in their presence. N.C. Gen. Stat. § 15A–401(b)(1).

370. Defendants Wylie, Lee, Brown, and Lynch had not observed Plaintiffs commit any crime, and no reasonable person would have believed probable cause existed for the arrests.

371. Defendants acted wantonly, contrary to their duty, and with the intent to injure Plaintiffs.

## PRAYER FOR RELIEF

74

WHEREFORE, Plaintiffs pray that the Court enter the following relief:

1. A declaration that Defendants' actions violated Plaintiffs' rights under the First, Fourteenth, and Fourth Amendments of the United States Constitution; Article I, Sections 14 and 19 of the North Carolina Constitution; and North Carolina common law;

2. Preliminary and permanent injunctions enjoining University Defendants from maintaining Plaintiffs Dames, Rogers, Newman, and Mohanarajah's bans from campus;

3. Preliminary and permanent injunctions enjoining University Defendants from summarily suspending and trespassing Plaintiff Mohananrajah, from campus for engaging in protected First Amendment activities without first providing constitutionally adequate notice and an opportunity to be heard;

4. Preliminary and permanent injunction enjoining University Defendants from summarily issuing indefinite bans from campus to Plaintiffs Dames, Rogers, and Newman for engaging in protected First Amendment activities in public fora without first providing proper notice their actions are in violation of University policy and an opportunity to be heard;

5. Award nominal, compensatory, and punitive damages to Plaintiffs Newman, Dames, and Rogers for the unlawful arrests perpetrated against them, respectively, by Defendants Brown, Wylie, Lee, and Lynch;

75

6. Award nominal, compensatory, and punitive damages to Plaintiff Rogers for the excessive force perpetrated by Defendant Lynch;

7. Award nominal damages to all Plaintiffs against all Defendants for First, Fourteenth, and Fourth Amendment violations and related state law claims;

8. Award attorneys' fees and costs pursuant to 42 U.S.C. §§ 1920 and 1988, or as otherwise authorized by law;

9. Award any additional and further relief as the Court may deem just and proper.

Respectfully submitted this the 11 day of March, 2025.

**ACLU OF NORTH CAROLINA LEGAL FOUNDATION**

/s/ Ivy A. Johnson
Ivy A. Johnson
N.C. Bar No. 52228
Daniel K. Siegel
N.C. Bar. No. 46397
P.O. Box 28004
Raleigh, NC 27611
T: (919) 532-3681
ijohnson@acluofnc.org
dsiegel@acluofnc.org

**EMANCIPATE NC**

/s/ Jaelyn D. Miller
N.C. Bar No. 56804
P.O. Box 309
Durham, NC 27701
T: (910) 228-3741

76

jaelyn@emancipatenc.org

**MUSLIM ADVOCATES**

/s/ Reem Subei
Reem Subei
N.C. Bar No. 60219
/s/ Golnaz Fakhimi
Golnaz Fakhimi\*
1032 15th Street NW #362
Washington, DC 20005
T: (419) 699-2080
reem@muslimadvocates.org
golnaz@muslimadvocates.org

*\*Notice of Special Appearance
forthcoming*

77