IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAILA JAMES, EMILY ROGERS,       )
KATHRYN NEWMAN, MATHANGI         )
MOHANARAJAH, and ANSHU SHAH,[1]  )
                                 )
          Plaintiffs,            )
                                 )
     v.                          )      25CV191
                                 )
LEE ROBERTS, AMY JOHNSON,        )
DESIREE RIECKENBERG, BRIAN JAMES,)
RASHEEM HOLLAND, LAWRENCE TWIDDY,)
J. KALA BULLETT, and AVERY COOK, )
*in their individual and official* )
*capacities*, and NICK LYNCH, N.G. )
BROWN, FNU LEE, and DESTINY WYLIE, )
*in their individual capacities*, )
                                 )
          Defendants.            )

<u>**MEMORANDUM OPINION AND ORDER**</u>

THOMAS D. SCHROEDER, District Judge.

     This case is before the court on the motion for preliminary
injunction by Plaintiffs Laila Dames, Emily Rogers, Kathryn
Newman, and Mathangi Mohanarajah.  (Doc. 11.)  Plaintiffs contend
that their ban from the University of North Carolina at Chapel
Hill ("UNC-CH") campus following arrest for trespass violates the
First Amendment.  (Doc. 12 at 2-3.)  Defendants Lee Roberts, Amy
Johnson, Desirée Rieckenberg, Brian James, Rasheem Holland,
Lawrence Twiddy, J. Kala Bullett, Avery Cook, Nick Lynch, N.G.
Brown, "FNU" Lee, and Destiny Wylie have filed a response in

---

[1] Plaintiff Anshu Shah voluntarily dismissed all his claims without
prejudice.  (Doc. 26.)

opposition (Doc. 19), and Plaintiffs filed a reply (Doc. 24). The court held a hearing on the motion on December 11, 2025, and Plaintiffs provided notice of supplemental authority. (Doc. 30.) For the reasons set forth below, the motion will be granted in part.

## I. BACKGROUND

The facts, taken from Plaintiffs' verified amended complaint, the parties' affidavits and declarations, and other materials of record, show the following:

In the wake of Israel's military action in Gaza following the killings of Israelis by Hamas militants on October 7, 2023, protesters associated with a group known as Students for Justice in Palestine engaged in protests on the UNC-CH campus. In November 2023, a group from that organization occupied UNC-CH's South Building during a workday. (Doc. 19-2 at 3.) Because of the noise and disruption, administrators had to cancel meetings and let some staff go home early. (Id.) Dr. Christi Hurt, chief of staff to UNC-CH Chancellor Lee Roberts, "dialogued" with the protesters and explained the extent to which their activities violated university policies. (Id.) After a warning from law enforcement, the protesters left. (Id.)

Various protesters from Students for Justice in Palestine engaged in "sporadic protests" through the spring 2024 semester. (Id.) In April, when Dr. Hurt learned that the group planned a

"large-scale protest event on UNC-CH's campus," she, along with other administrators, engaged in conversations with the group's leadership to reiterate UNC-CH's policies and limitations on expressive activity on campus. (Id.)

On the morning of Friday, April 26, 2024, a group of protesters erected approximately twenty-five tents of various sizes on Polk Place, an outdoor grassy quad on the UNC-CH campus surrounded by academic and administrative buildings, and engaged in a demonstration "to express solidarity with the nationwide movement across university campuses for Palestinian lives and liberation." (Doc. 10 ¶¶ 1-2, 58.) These protesters eventually included Plaintiffs Mohanarajah, a former UNC-CH student on a leave of absence; Rogers, a professor at Duke University; Dames, a student at Duke University; and Newman, a student at Meredith College. (Id. ¶¶ 1, 12-15.) None of Plaintiffs organized the encampment or exercised any authority over the conduct of the other protesters. (Id. ¶¶ 59, 100-01, 129-30, 151-52, 175, 180.)

"As a state institution, outdoor public spaces on [UNC-CH's] campus are open to all regardless of their views, as long as they follow the law and University policies." (Id. ¶ 40 n.5; Doc. 10-1 at 1.) UNC-CH policy permits the assembly and gathering of non-university-affiliated groups at Polk Place without prior approval. (Doc. 10 ¶ 43; Doc 19-2 at 23.) According to Plaintiffs, Polk Place and the surrounding buildings have historically served as a

3

favored venue for student protest movements, including the anti-Vietnam War protests, the late 1960s food worker strikes, and the 1986 anti-apartheid protest. (Doc. 10 ¶¶ 256-97.)

Nevertheless, UNC-CH's Freedom of Speech and Expression Standard notes that UNC-CH may restrict speech and expression "that materially and substantially disrupts the functioning of the University." (Doc. 19-2 at 11.) Section II.D.2 of UNC-CH's Facilities Use Policy also prohibits the erection of temporary structures (like tents) on Polk Place unless the structures' "use is approved by the applicable University official in connection with the scheduling process." (Id. at 24.) Further, the UNC-CH Policy on Demonstrative Events provides that UNC-CH students, faculty, staff, and visitors who occupy an outdoor space without a posted closure time (like Polk Place) "will be subject to arrest and trespass if they are asked to leave and fail to do so." (Id. at 15-16.)

Throughout the day of Friday, April 26, Dr. Hurt worked with UNC-CH's dean of students to listen to the protesters' concerns and explain how the erection of tents violated UNC-CH's facilities use standard. (Id. at 3-4.) Initially, the protesters stated they would remove the tents if senior leadership scheduled a meeting for them with Chancellor Roberts. (Id. at 4.) UNC-CH arranged to accommodate the request, but the protesters changed tack and decided they no longer wished to participate in such a

4

meeting.  (Id.)  Eventually, "after additional discussions, the protesters agreed to take down the tents."  (Id.)

The protesters maintained a presence on Polk Place throughout the weekend of April 27 to 28.  (Id.)

On Sunday, April 28, UNC-CH Chief of Police Brian James was present when protesters erected tents again, in violation of UNC-CH policies and direct instructions of administrators.  (Doc. 19-3 at 3.)  Chief James "learned that protesters declined to engage in further discussions with senior administrators, despite being informed of the policy violations on multiple occasions."  (Id.)  Dr. Hurt was informed of the new tents.  (Doc. 19-2 at 4.)  "[A]dministrators attempted to continue discussions with the protesters about UNC-CH's concerns, [but] the protesters refused to engage in any dialogue or communication with campus administrators after this point."  (Id.)  Plaintiffs admit that the protesters were made aware that the tents violated UNC-CH policy, although they contend that nobody ever informed Plaintiffs directly.  (Doc. 10 ¶¶ 87-89.)

"As the days continued, UNC-CH administrators became concerned about the disruption the protesters' activities were causing to the campus community."  (Doc. 19-2 at 4-5.)  Specifically, the protesters had caused physical damage to the campus by staking signs into the ground, covering sprinkler heads, and permitting trash to pile up around the encampment.  (Id. at

5

5.)  Students reported feeling intimidated by the protesters, causing students to avoid the area entirely and making navigating campus "more difficult." (Id.)  Moreover, the protesters had begun propping open the doors of nearby campus buildings - Gardner Hall and the Campus YMCA - overnight to access the buildings' bathroom facilities, leaving the buildings accessible to anyone at any hour. (Id.)  These doors otherwise would have remained closed to limit building access to authorized members of the campus community. (Id.)  UNC-CH administrators became concerned both about the security of the campus community and the potential disruption of upcoming events, like commencement.  (Id.)

UNC-CH leadership determined that the disruption caused by the protest and encampment, and the continuing violation of university policies, required clearing of the encampment and dispersal of the protesters.  (Id.)  To minimize disruption to the campus community, and based on advice of Chief James, administrators decided to clear the encampment in the early morning hours of April 30, when the fewest protesters would be present. (Id.)

On April 30, at approximately 5:30 a.m., UNC-CH administrators arrived at the encampment and disseminated copies of a letter signed by Chancellor Roberts to the protesters.  (Doc. 10 ¶ 81.)  The letter referenced the protesters' refusal to comply with UNC-CH policies, including the inappropriate overnight

6

trespass of campus buildings. (Doc. 10-2.) The letter further explained UNC-CH's concerns over the safety of the campus community as well as the potential disruption of UNC-CH's educational environment, particularly considering the upcoming final exams and commencement. (Id.) The letter demanded that the protesters depart from Polk Place by 6:00 a.m. and warned that failure to comply could result in arrest, suspension from campus, and even expulsion from UNC-CH. (Id.) Plaintiffs allege that they had not yet personally received the letter at 6:00 a.m. (Doc. 10 ¶ 90.)

Prior to clearing the tents, Chief James also gave a verbal warning to the protesters, stating to those who remained that they should disperse and that anyone who wished to leave would be permitted to do so without the need for arrest. (Doc. 19-2 at 6.) Chief James advised, however, that those who chose to remain at the encampment would be "in violation of criminal trespassing statutes and would be cited accordingly." (Id.)

Plaintiffs Rogers, Dames, and Newman awoke to someone conveying that police would begin arresting protesters who did not depart Polk Place by 6:00 a.m. (Doc. 10 ¶¶ 109, 138, 160.) Moreover, Plaintiffs Rogers, Dames, and Newman witnessed the police tearing down the encampment and arresting protesters. (Id. ¶¶ 110, 139, 161.) Nevertheless, Plaintiffs all remained at Polk Place after the 6:00 a.m. deadline, and Plaintiffs Rogers, Dames, and Newman were arrested and cited for criminal trespass. (Id.

7

¶¶ 116, 140, 162.) Plaintiff Mohanarajah was detained and subsequently suspended from UNC-CH. (Id. ¶¶ 184-86.) Protesters who departed Polk Place before the 6:00 a.m. deadline, however, were not detained or arrested. (See id. ¶ 213.) Moreover, on April 30 and in the days following the removal of the encampment, UNC-CH continued to permit protesters to gather and "show solidarity with Palestinian lives and liberation." (Id. ¶¶ 120, 146, 169.)

That same day, Plaintiffs Dames, Newman, and Mohanarajah were issued a UNC-CH Trespass Notice. (Id. ¶¶ 143, 165; Doc. 19-3 at 12-15, 18-19.) Plaintiff Rogers, meanwhile, received her Trespass Notice on May 3, 2024. (Doc. 10 ¶ 118; Doc. 19-3 at 16.) The Trespass Notice, which appears to be a standard UNC-CH document, contains an express statement that it had been issued because of each Plaintiff's refusal to leave Polk Place after being ordered to do so. (See Doc. 19-3 at 12, 14, 16, 18.) As a consequence, the Trespass Notice states that each would be banned from the UNC-CH campus. (Id. at 18; Doc. 10 ¶¶ 143, 165.) More specifically, the Trespass Notice states, each cited individual is "prohibited from entering upon . . . [a]ny and all property owned or controlled by the [UNC-CH]." (See, e.g., Doc. 10-7.) Excepted from the bans are travel on public streets through campus, receiving emergency treatment at UNC-CH Hospital, and, with prior notice, attending the healthcare facilities at UNC-CH. (Id.) Each

ban contains a notice of the recipient's right to submit a written appeal to Chief James within ten days. (See, e.g., Doc. 19-3 at 13.) Finally, the campus bans are "valid indefinitely unless otherwise modified by the [UNC-CH] Police Department"; however, "[a]fter a period of no less than twenty-four (24) months, [Plaintiffs] may seek relief" from Chief James.[2] (See, e.g., id. at 12.)

Plaintiffs appealed their campus bans, and Chief James convened a meeting with Plaintiffs and their legal counsel on July 5, 2024. (Id. at 6; Doc. 10 ¶¶ 219, 221-22.) Chief James listened to the arguments from Plaintiffs' counsel but did not identify any witnesses or other evidence. (Doc. 10 ¶ 225.) On August 12, 2024, Chief James issued each Plaintiff an individualized Final Decision letter, declining to lift the campus bans. (Doc. 10 ¶¶ 231-32; see, e.g., Doc. 19-3 at 25-30.) The letters reiterated that Plaintiffs had been ordered to depart Polk Place and ultimately banned from campus because of violations of UNC-CH's Facilities Use Policy along with "other safety and security concerns." (See, e.g., Doc. 19-3 at 25-30.)

On November 5, 2024, UNC-CH's Emergency Evaluation and Action Committee ("EEAC") lifted Plaintiff Mohanarajah's suspension.

---

[2] Notably, Plaintiffs do not levy a First Amendment challenge against any of the previously outlined UNC-CH policies regarding free speech and expression, facilities use, or demonstrative events. Rather, their First Amendment challenge is limited to the campus bans, which UNC-CH contends were imposed because of Plaintiffs' violation of these policies.

(Doc. 10 ¶ 239; see Doc. 10-9.)  Chief James then modified her campus ban to allow her return to campus on a case-by-case basis if she notified him beforehand of her specific intended destinations.  (Doc. 10 ¶ 240.)  In January 2026, Chief James lifted Plaintiff Mohanarajah's ban based upon her re-enrollment at UNC-CH, mooting her request for preliminary injunctive relief. (Doc. 29.)  The campus bans of Plaintiffs Rogers, Dames, and Newman remain unchanged, although the Orange County District Attorney's Office dismissed all trespass cases related to the April 30 protest encampment.  (Doc. 10 ¶ 255.)  Plaintiffs contend that they would continue to participate in First Amendment-protected conduct on the open, outdoor spaces of the UNC-CH campus if not for their campus bans.  (Id. ¶¶ 125, 147, 170.)

On March 11, 2025, nearly one year after the Trespass Notices were issued, Plaintiffs filed the present action, and, in late April 2025, requested that the court enter a preliminary injunction against Defendants' enforcement of Plaintiffs' bans from campus. (Doc. 11.)  Defendants oppose injunctive relief, contending that the bans were properly entered as a consequence of Plaintiffs' trespass.  (Doc. 19.)  The court heard argument on the motion, which is ready for decision.

## II.  ANALYSIS

### A.  Standard of Review

In order to obtain a preliminary injunction, a party must

make a "clear showing" that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 21 (2008). All four requirements must be satisfied for relief to be granted. Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010). A preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." Direx Isr., Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991) (alteration in original) (quoting Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989)). Plaintiffs must show more than a grave or serious question for litigation; they must "clearly" demonstrate that they are "likely" to succeed on the merits. Real Truth About Obama, 575 F.3d at 346-47. Moreover, "where a plaintiff asserts multiple claims, the court need only find that a plaintiff is likely to succeed on one of his claims in order for this factor to weigh in favor of a preliminary injunction." Am. Fed'n of State, Cnty. & Mun. Emps. v. Soc. Sec. Admin., 778 F. Supp. 3d 685, 759 (D. Md. 2025).

## B. Likelihood of Success on the Merits

Plaintiffs first contend that the campus bans constitute

11

prior restraints on their First Amendment expression, in part because Chief James exercises sole discretion on whether to lift the bans after twenty-four months. (Doc. 12 at 13-14.) Plaintiffs further argue that the court should apply strict scrutiny to the campus bans, while also asserting that the bans cannot satisfy even an intermediate level of scrutiny. (Id. at 16-21.) Defendants counter that the campus bans are subsequent punishments, not prior restraints. (Doc. 19 at 16.) Moreover, Defendants contend that the bans comply with the First Amendment because they are viewpoint neutral and reasonable considering UNC-CH's purpose as a public university. (Id. at 15.)

In its memorandum opinion and order filed contemporaneously with this decision (Doc. 31), the court dismissed Plaintiffs' prior restraint claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. However, Plaintiffs' motion for preliminary injunction more broadly challenges the campus bans as unconstitutional restrictions on their First Amendment conduct. (Doc. 12 at 14-21.) Specifically, Plaintiffs argue that their indefinite bans – even if not subject to prior restraint analysis – cannot satisfy First Amendment scrutiny because, at minimum, they burden substantially more speech than necessary. (Id. at 18-21.) Plaintiffs then include the First Amendment forum analysis as grounds for their likelihood of success on the prior restraint claims. (Id. at 14-15.) Defendants, moreover, fully address the

12

forum analysis in their response. (Doc. 19 at 17-18.) Therefore, the court will consider whether Plaintiffs have demonstrated a likelihood of success on the merits of whether the campus bans – even as subsequent punishments - unconstitutionally restrict their First Amendment rights.[3]

Plaintiffs do not mount a facial challenge to the indefinite ban that appears as a standard provision of UNC-CH's Trespass Notice; however, they do challenge it as applied to them. Such an indefinite ban raises heightened concerns when it arises in the context of the banned individuals' right to engage in First Amendment conduct. See Arcara v. Cloud Books, Inc., 478 U.S. 697, 706 (1986) (holding that First Amendment scrutiny applies to criminal or civil sanctions "where it was conduct with a significant expressive element that drew the legal remedy in the first place").

To assess a First Amendment claim alleging an unconstitutional restriction of speech, "the court must begin the inquiry by determining whether the plaintiff had engaged in protected speech." Am. C.L. Union, Student Chapter-Univ. of Md., Coll. Park v. Mote, 423 F.3d 438, 442 (4th Cir. 2005). Then, the

---

[3] In their verified amended complaint, Plaintiffs style these claims as viewpoint discrimination claims. (Doc. 10 ¶¶ 337-44.) However, "[t]he standards that [courts] apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106 (2001).

13

court "must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Id. (quoting Goulart v. Meadows, 345 F.3d 239, 246 (4th Cir. 2003)). Last, "the court must determine whether the justifications for the exclusion satisfy the requisite standard for that forum." Id. at 443.

First, to the extent Plaintiffs engaged in expressive conduct or speech of a political nature, it is undoubtedly protected speech. See id. Second, Defendants are correct that Polk Place represents a limited public forum. A university campus "is not akin to a public street, park, or theater, but instead is an institute of higher learning that is devoted to its mission of public education." Mote, 423 F.3d at 444. Nevertheless, for purposes of this case, UNC-CH policies, such as the Policy on Demonstrative Events, have opened the UNC-CH campus to visitors for First Amendment-related activities. (See Doc. 19-2 at 14); Mote, 423 F.3d at 444.

"After determining that a limited public forum exists, a court must next determine whether an internal or external standard should apply."[4] Mote, 423 F.3d at 444. "An internal standard applies

---

[4] In recent opinions addressing limited public forums, the Fourth Circuit has applied the external standard without considering the external versus internal distinction. See, e.g., Platt v. Mansfield, 162 F.4th 430, 434 (4th Cir. 2025) ("In a limited public forum, the government may restrict speech so long as the limits are reasonable in light of the forum's purpose and not based on viewpoint." (citing Good News Club, 533 U.S. at 106-07)). Indeed, since Mote, the Supreme Court has applied the

14

and the restriction is subject to strict scrutiny 'if the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available.'" Id. (alteration in original) (quoting Warren v. Fairfax County, 196 F.3d 186, 193 (4th Cir. 1999)). "An external standard applies if the person excluded is not a member of the group that the forum was made generally available to." Id.

Polk Place has been made generally available to visiting members of the public. In fact, UNC-CH policy expressly permits the use of "Major Open Spaces" like Polk Place by non-university-affiliated groups "without prior approval." (Doc. 19-2 at 23.) However, Defendants contend that Plaintiffs' failure to comply with UNC-CH's policies removed them from the internal group. (Doc. 19 at 18.) Defendants cite Wood v. Arnold, 321 F. Supp. 3d 565, 583 (D. Md. 2018), aff'd, 915 F.3d 308 (4th Cir. 2019), where the court found that a high school student's father removed himself from the group for which the school had been opened after hours (namely, parents) when his threats "caused school officials to be concerned about safety at the school."

Indeed, Polk Place and other outdoor spaces on UNC's campus

_____

external standard to student group plaintiffs that seem clearly within the class to which the limited public forum was made generally available. See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez, 561 U.S. 661, 679-85 (2010). Because the court here finds that the external standard applies, however, it is immaterial whether the two-tiered external/internal distinction survives.

15

are open to all members of the public only "as long as they follow the law and University policies." (Doc. 10-1 at 1.) Here, the parties do not dispute that the tents set up by the protesters violated UNC-CH policy against temporary structures. (See Doc. 10 ¶¶ 87-89; Doc. 19-2 at 24.) Further, the letter issued on the morning of April 30 by Chancellor Roberts demonstrates that the encampment raised safety concerns for UNC-CH, as protesters "trespassed into classroom buildings overnight," propped doors open, and "made it clear they w[ould] no longer even consider [administration] requests to abide by University policies." (Doc. 10-2.) Plaintiffs then refused to leave Polk Place even after receiving notice to disperse. (Doc. 10 ¶¶ 109-10, 138-39, 160-61.) Accordingly, like the threatening conduct of the student's father in Wood, Plaintiffs' conduct removed them from the group to whom Polk Place was generally made available, and the external standard applies.

"Under the external standard, 'the selection of a class by the government must only be viewpoint neutral and reasonable in light of the objective purposes served by the forum.'"[5] Mote, 423

---

[5] Plaintiffs cite McTernan v. City of York, 564 F.3d 636 (3d Cir. 2009), and Huminski v. Corsones, 396 F.3d 53 (2d Cir. 2005), to argue that the court should apply heightened scrutiny to the campus bans because they target specific individuals and do not "emanate from deliberative, democratic decisionmaking processes." (Doc. 12 at 18-19 (quoting McTernan, 564 F.3d at 654).) However, as Plaintiffs acknowledge, the Fourth Circuit has never decided whether heightened scrutiny applies to orders from law enforcement. (Doc. 24 at 6 (citing Ross v. Early, 746 F.3d 546, 553 (4th Cir. 2014)).) Indeed, Plaintiffs also cite Bernstein

16

F.3d at 444 (quoting <u>Warren</u>, 196 F.3d at 194). Public universities primarily serve as "venue[s] for the students, faculty, and staff of the University to obtain an education, not to provide an open meeting place for the unstructured expression of public points of view." <u>ACLU Student Chapter-Univ. of Md. Coll. Park v. Mote</u>, 321 F. Supp. 2d 670, 680 (D. Md. 2004), <u>aff'd</u>, 423 F.3d 438 (4th Cir. 2005). This educational purpose predominates even when a university opens parts of its campus to groups beyond the university community. <u>Id.</u>

Still, "[c]ourts cannot, of course, abdicate their constitutional responsibility to delineate and protect fundamental liberties." <u>Pell v. Procunier</u>, 417 U.S. 817, 827 (1974). Thus, while First Amendment rights must be analyzed "in light of the special characteristics of the school environment," <u>Tinker v. Des Moines Indep. Sch. Dist.</u>, 393 U.S. 503, 506 (1969), and while the Supreme Court has cautioned courts to resist "substitut[ing] their own notions of sound educational policy for those of the school authorities which they review," <u>Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 206 (1982), no deference is owed a public university in considering whether a university has exceeded constitutional

---

v. Sims, 643 F. Supp. 3d 578, 585 (E.D.N.C. 2022), where the court did not apply heightened scrutiny to a trespass notice. Thus, because the challenged bans need "only be viewpoint neutral and reasonable in light of the objective purposes served by the forum," <u>Mote</u>, 423 F.3d at 444 (quoting <u>Warren</u>, 196 F.3d at 194), Defendants need not explain why they could not simply remove the tents at Polk Place and let the protesters remain. (<u>Contra</u> Doc. 12 at 17-18, 20.)

constraints, <u>Christian Legal Soc'y Chapter of the Univ. of Cal.,</u> <u>Hastings Coll. of the L. v. Martinez</u>, 561 U.S. 661, 687 (2010).

Turning first to viewpoint neutrality, Plaintiffs have not demonstrated a likelihood of success at this early stage that their Trespass Notices and resulting campus bans were <u>motivated</u> <u>by</u> viewpoint discrimination rather than their refusal to depart Polk Place.[6]  Plaintiffs rightly raise the argument, however, that the bans remain susceptible to challenge based on the unbridled discretion doctrine.  (<u>See</u> Doc. 12 at 13.)

"[V]iewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to <u>protect</u> against the improper exclusion of viewpoints."  <u>Child Evangelism Fellowship of Md.,</u> <u>Inc. v. Montgomery Cnty. Pub. Schs.</u>, 457 F.3d 376, 384 (4th Cir. 2006).  Moreover, "the dangers posed by unbridled discretion – particularly the ability to hide unconstitutional viewpoint discrimination – are just as present" in limited public forums as

---

[6] In their verified amended complaint, Plaintiffs do allege disparate treatment of past protesters.  (Doc. 10 ¶¶ 256-318; <u>see</u> <u>Platt</u>, 162 F.4th at 443 ("Pointing to differential treatment of others who engaged in similar conduct can support a viewpoint-discrimination claim.").  However, Plaintiffs have not sufficiently demonstrated that past protesters engaged in similar conduct to support a likelihood of success on the merits.  For example, UNC-CH permitted the anti-apartheid protesters to rebuild their encampment after approval from the Chancellor, while the protesters here refused to even attend an arranged meeting with Chancellor Roberts.  (<u>Contrast</u> Doc. 10 ¶ 287, <u>with</u> Doc. 19-2 at 4.)  Plaintiffs have also not provided evidence of the applicable UNC-CH policies, if any, on tents during prior protests.

in traditional public forums.  Id. at 386.  Accordingly, "a policy . . . that permits officials to deny access for any reason, or that does not provide sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny."  Id. at 387.

Here, the issue is not whether Chief James would fail to act in good faith in considering whether to lift the bans; rather, it is that Defendants do not provide any express standard governing Chief James's decision whether to permit Plaintiffs to return to the UNC-CH campus, nor do the Trespass Notices identify such standards.  (See Doc. 10-7.)  This "'absence of express standards' renders it difficult to differentiate between a legitimate denial of access and an 'illegitimate abuse of censorial power'" and thereby fails to "ensure the requisite viewpoint neutrality." Child Evangelism Fellowship, 457 F.3d at 386, 389 (quoting City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 758 (1988)).

Moreover, the campus bans imposed here must be reasonable in light of the "forum's function and 'all the surrounding circumstances.'"  Christian Legal Soc'y, 561 U.S. at 687 (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 809 (1985)).  Ultimately, the "decision to restrict access to a limited public forum 'need only be reasonable; it need not be the most reasonable or the only reasonable limitation.'"  Goulart, 345 F.3d at 255 (quoting Cornelius, 473 U.S. at 806).  And in

determining reasonableness, courts should "review the justifications [a school] offers in defense" of its restrictions with "appropriate regard for school administrators' judgment." Christian Legal Soc'y, 561 U.S. at 687.

To defend the bans' reasonableness, Defendants point to the protesters' disruptive conduct on campus and note that the bans do not expressly impact Plaintiffs' speech. (Doc. 19 at 18-19.) Specifically, Defendants contend that UNC-CH reasonably may "seek to limit the access to campus of those who disrupted the campus previously." (Id. at 19.) Of course, depending on the grounds, universities and schools can ban individuals from campus for a definite, and perhaps lengthy, period in response to the individuals' violative or threatening conduct. E.g., Donnelly v. Univ. of N.C., 763 S.E.2d 154, 158 (N.C. Ct. App. 2014) (holding even an indefinite ban not unreasonable, under an arbitrary and capricious standard, where "based on a series of incidents over a number of years where [the individual] engaged in inappropriate behavior toward UNC athletes, the family members of athletes, athletic staff members, and fans"). In Wood, the court upheld a parent's no trespass order from his child's high school in part because the order "was limited in duration[] and was reasonable in order to ensure that [he] did not disrupt school-related functions reserved for other parents." Wood, 321 F. Supp. 3d at 583. As noted, the protesters here, as a group, presented legitimate and

20

serious security concerns. (See Doc. 10-2.) UNC-CH undoubtedly has a duty to provide a safe, nondisruptive educational environment for its students (who pay substantial tuition and fees for their education), faculty, and staff, especially in the time preceding final exams and graduation. (See id.)

Moreover, "the availability of alternative channels of communication" factors into whether a regulation on speech in a limited public forum is reasonable. See Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 815 (1984). Plaintiffs allege that Polk Place "carries a unique value" because of its historical significance to past protest movements. (Doc. ¶¶ 104, 134, 156, 177.) But the reality is that Plaintiffs Rogers, Dames, and Newman – none of whom has ever been a UNC-CH student or even affiliated with UNC-CH – remain free to express their First Amendment support for their causes at countless venues outside the UNC-CH campus. Further, as already noted, Chief James lifted Plaintiff Mohanarajah's campus ban as soon as she re-enrolled at UNC-CH. (Doc. 29.) Thus, the bans impose a limited impact on Plaintiffs' broader ability to engage in their desired expressive conduct. Cf. Bernstein v. Sims, 643 F. Supp. 3d 578, 586 (E.D.N.C. 2022) (finding a trespass notice did not permit an adequate alternative where the plaintiff had no other means of attending the public meetings of the county board of elections).

As Plaintiffs correctly assert, however, Defendants offer no

21

explanation for how the indefinite <u>duration</u> of the campus bans imposes a reasonable restriction on Plaintiffs' First Amendment expression on the UNC-CH campus. According to the standard Trespass Notices, the bans remain "valid indefinitely unless otherwise modified by the [UNC-CH] Police Department." (<u>E.g.</u>, Doc. 10-7.) Moreover, unlike the student's father in <u>Wood</u>, Chief James's Final Decision letters indicate that Plaintiffs Dames, Rogers, and Newman cannot even attempt to seek relief from the bans until the passage of twenty-four months from the date of his denial of their appeals (which is even later than the date the Trespass Notices indicated).[7] (Doc. 19-3 at 26, 28, 30); <u>cf.</u> <u>Wood</u>, 321 F. Supp. 3d at 583 n.18 (noting that the no trespass order could be rescinded at any time if the father "calmly met" with the school's principal).

As a result, the bans continue to remain in effect nearly two years after the issuance of the Trespass Notices, with no end in sight. According to Plaintiffs, they would otherwise have continued to gather on campus "to show solidarity with Palestinian lives and liberation," and still wish to do so, in a manner permitted by UNC-CH. (<u>See</u> <u>id.</u> ¶¶ 120, 146, 169.) Yet under the current bans, Plaintiffs remain unable to do so in the open,

---

[7] As previously noted, Chief James has lifted Plaintiff Mohanarajah's campus ban on January 14, 2026, and her claim for injunctive relief is now moot. (Doc. 29.)

outdoor spaces of UNC-CH's campus.  (Id. ¶¶ 125, 147, 170.)

Further, Defendants have not proffered any basis for why this indefinite ban from a forum is reasonable for these Plaintiffs, who wish to engage in the continued demonstrations on UNC-CH's open, outdoor spaces.  Apart from Plaintiffs being present when the tent encampment was dismantled, Defendants have not proffered any evidence that any Plaintiff personally engaged in the disruptive conduct that led to UNC-CH's decision to disperse the protesters on April 30.[8]  In contrast, other protesters who were initially present when the tent encampment was dismantled but then departed Polk Place by the 6:00 a.m. deadline did not receive any punishment.  (See Doc. 10 ¶¶ 212-13.)  All criminal trespass cases against Plaintiffs, moreover, have been dismissed.[9]  (Id. ¶ 255.)

Ultimately, the indefinite duration of the bans, coupled with the absence of any standard governing whether to re-admit Plaintiffs onto the UNC-CH campus and the limited evidence of

---

[8] Indeed, when Chief James lifted Plaintiff Mohanarajah's ban on January 14, 2026, upon her re-enrollment at UNC-CH, he stated, "I welcome you back and I hope you have a great semester and best of luck in the future." (Doc. 29-2.)  This Plaintiff is now free to continue to exercise her First Amendment rights on campus.  Defendants have offered no reason to suggest that she presents any concern for the campus, nor is there any reason offered to suggest that the remaining Plaintiffs would present any concern.

[9] This dismissal, of course, does not invalidate the Trespass Notices. See N.C. Gen. Stat. § 14-159.13(a)(1) ("A person commits the offense of second degree trespass if, without authorization, the person enters or remains on . . . premises of another after the person has been notified not to enter or remain there by the owner [or] by a person in charge of the premises . . . .").

23

Plaintiffs' specific involvement in alleged wrongdoing, renders the bans unreasonable as to these Plaintiffs under the limited facts of record in light the purpose of the forum. Accordingly, Plaintiffs have made a clear showing of a likelihood of success on the merits of their contention that their complete, indefinite ban from the UNC-CH campus violates their First Amendment rights of expression, and the first <u>Winter</u> factor favors injunctive relief.[10] <u>See</u> <u>Wirtshafter v. Trs. of Ind. Univ.</u>, No. 24-cv-00754, 2026 WL 60336, at *15 (S.D. Ind. Jan. 8, 2026) (finding that the plaintiffs' one-year campus bans violated the First Amendment, albeit under a higher level of scrutiny, in part because the bans "lacked a . . . carveout for First Amendment expression").

C. **Remaining <u>Winter</u> Factors**

The remaining <u>Winter</u> factors also weigh in favor of a preliminary injunction. As Plaintiffs rightly assert, when "there is a likely constitutional violation, the irreparable harm factor is satisfied." <u>Leaders of a Beautiful Struggle v. Balt. Police Dep't</u>, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). The harm caused by Defendants' likely First Amendment violation persists despite

---

[10] Because Plaintiffs do not raise any facial challenge to UNC-CH's policies at issue here, nothing in this memorandum opinion and order should be construed to limit Defendants' future enforcement of such policies or the Trespass Notices under a different set of circumstances. <u>See</u> <u>Richmond Med. Ctr. for Women v. Herring</u>, 570 F.3d 165, 172 (4th Cir. 2009) (en banc) (noting that an as-applied challenge is "based on a developed factual record and the application of a statute to a specific person").

Plaintiffs' apparent delay in filing suit. See <u>Stewart v. Justice</u>, 502 F. Supp. 3d 1057, 1070 (S.D. W. Va. 2020) ("Deprivation of a constitutional right, even for a short period of time, constitutes irreparable harm." (citing <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976) (plurality opinion))).

Moreover, the final two factors – the balance of the equities and the public interest – "merge when the Government is the opposing party." <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009). "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional . . . [and] upholding constitutional rights surely serves the public interest." <u>Centro Tepeyac v. Montgomery County</u>, 722 F.3d 184, 191 (4th Cir. 2013) (quoting <u>Giovani Carandola, Ltd. v. Bason</u>, 303 F.3d 507, 521 (4th Cir. 2002)). Accordingly, Defendants will be enjoined from enforcing the Trespass Notice bans during the pendency of this action.

### D. Security

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the court must consider whether plaintiffs should provide security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." A nominal bond may sometimes suffice. <u>Hoechst Diafoil Co. v. Nan Ya Plastics Corp.</u>, 174 F.3d 411, 421 n.3 (4th Cir. 1999). Here, because Defendants do not request any

security from Plaintiffs, and considering the important constitutional rights at issue, the court declines to require a bond.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the motion for preliminary injunction (Doc. 11) by Plaintiff Mohanarajah is DENIED as moot.

IT IS FURTHER ORDERED that the motion for preliminary injunction (Doc. 11) by Plaintiffs Dames, Rogers, and Newman is GRANTED IN PART and that Defendants, their officers, agents, employees, and other persons in active concert or participation with them are hereby PRELIMINARY ENJOINED, during the pendency of this action, from further enforcing the Trespass Notice bans from UNC-CH campus previously issued against Plaintiffs Dames, Rogers, and Newman. No bond shall be required.

                                        /s/   Thomas D. Schroeder
                                        United States District Judge
February 4, 2026